**TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

EAST RIVER REALTY COMPANY LLC,

Plaintiff,

- against -

TRC COMPANIES, INC.,
TRC ENGINEERS, INC., and
TRC ENVIRONMENTAL CORPORATION,

Defendants.

------------------------------------------------------------ X

Docket No. ______________

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff East River Realty Company, LLC ("ERRC" or "Plaintiff"), by and through its attorneys, Mayer, Brown, Rowe & Maw LLP, as and for its Complaint against defendants TRC Companies, Inc., TRC Engineers, Inc. and TRC Environmental Corporation (collectively, "TRC" or "Defendants") alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff ERRC is the developer of a significant piece of real estate located on the East Side of Manhattan. The property had previously been owned by Consolidated Edison Company of New York ("Con Edison"), which operated large steam and power generating plants there for more than 100 years. Contemporaneously with ERRC's purchase of the property from Con Edison, TRC Companies, Inc., a large public-company environmental-remediation firm (together with its affiliates), and Con Edison entered into a contract whereby TRC agreed to

remediate the property in full and prepare it for residential and commercial development by ERRC.

2. This action seeks to compel TRC to abide by its contractual obligation to participate in a voluntary cleanup program administered by the New York State Department of Environmental Conservation ("NYSDEC"). In this newly-enacted Brownfield Cleanup Program ("BCP"), tax credits and other benefits are granted to landowners and developers such as ERRC that shoulder the considerable financial burden associated with remediating, and restoring to unrestricted use, real estate located in New York historically contaminated by hazardous wastes and petroleum. Pursuant to this and its predecessor program, ERRC has committed to spend hundreds of millions of dollars on remediation, redevelopment and construction on this property. NYSDEC's new cleanup program promotes environmental restoration and preservation, public health protection, economic development, job creation and community revitalization throughout this City and State.

3. TRC has nonetheless refused to participate in this program with ERRC despite its contractual obligation to do so. Instead, TRC has attempted to hold up ERRC's entry into this vital program by attempting to extract unrelated concessions, including a broad release from ERRC for most of TRC's past conduct on this project, and sizeable cash payments from ERRC in exchange for TRC's agreement to participate in NYSDEC's cleanup program. TRC's illegitimate and commercially unreasonable actions are presently jeopardizing ERRC's entitlement to very significant present and future tax credits and other meaningful benefits, including statutorily-mandated broad releases from future liability upon the completion of the remediation of the purchased real estate. If TRC is not promptly compelled to participate in this New York State program, ERRC will irrevocably lose these important benefits.

**PARTIES**

4. Plaintiff ERRC is a limited liability company organized and existing under the laws of New York and having a principal place of business in New York. The members of ERRC, also limited liability companies, have members that are citizens of New York and Nevada. None of the members of ERRC, including those that directly or indirectly hold membership interests in ERRC's members, are citizens of Delaware or Connecticut.

5. Defendant TRC Companies, Inc., a public company, is a Delaware corporation with its principal place of business in Connecticut.

6. Defendant TRC Engineers, Inc. is a New Jersey corporation with its principal place of business in New Jersey.

7. Defendant TRC Environmental Corporation is a Connecticut corporation with its principal place of business in Connecticut.

8. TRC Companies, Inc. is the parent company of TRC Engineers, Inc. and TRC Environmental Corporation, each of which executed the Exit Strategy Contract described in paragraph 18 below and agreed to be jointly and severally liable for the obligations of the TRC companies under such contract pursuant to Section 28 of the ESC.

9. Among other services, TRC provides environmental services to its customers and beneficiaries in order to assist them in complying with federal, state and local environmental laws. To that end, TRC describes its "Exit Strategy" environmental remediation program as providing its customers and beneficiaries with a cost-effective method for managing their environmental remediation activities, including the redevelopment of commercially viable but environmentally contaminated property that is commonly referred to as "brownfields" real estate redevelopment.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this matter, including, but not limited to, jurisdiction pursuant to 28 U.S.C. § 1332.

11. There is complete diversity between the plaintiff and the defendants.

12. The amount in controversy exceeds $75,000.

13. Venue is proper in this Court under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to this matter occurred in this District and/or defendants have one or more agents in and/or transact or have transacted business in this District.

## FACTUAL BACKGROUND

**The Properties**

14. ERRC owns four parcels of real estate in the City of New York commonly described as follows: 616 First Avenue ("Kips Bay"), 685 First Avenue, 700 First Avenue and 708 First Avenue (the latter two are known as "Greater Waterside" when jointly referred to herein).

15. All of the parcels described in paragraph 14 above (collectively, the "Properties") have environmental histories that require remediation to make them developable for unrestricted residential and commercial use.

16. Ownership of the properties was legally transferred to ERRC from Con Edison by May, 2005.

**The Relevant Contracts and Documents**

17. On or about November 15, 2000, Con Edison and FSM East River Associates LLC ("FSM") (now ERRC) entered into an agreement pursuant to which Con Edison would sell and ERRC would purchase the Properties (as amended, the "Purchase and Sales Agreement"). A

copy of the Purchase and Sales Agreement (without its exhibits and amendments) is attached hereto as Exhibit A.

18. On or about November 15, 2000, pursuant to and simultaneous with entry into the Purchase and Sales Agreement, Con Edison entered into an agreement known as the Exit Strategy Contract ("ESC") with TRC by which TRC accepted from Con Edison any and all liability and responsibility Con Edison may have had for or associated with the demolition, decommissioning and remediation of all structures on the Properties, and certain structures that extend off-site from the Properties, including contractual liabilities, as well as liability under existing and future federal, state and local laws and regulations. A copy of the ESC (without its exhibits or amendments) is attached as Exhibit B.

***The ESC***

19. Under the ESC, TRC agreed (i) to remediate all pre-existing contamination on and off-site from the Properties, (ii) to prepare them for Unencumbered Development (as that term is defined in ESC Section 1(vv)), and (iii) to obtain regulatory closure of all such pre-existing contamination. In connection with complete remediation of the subject properties, TRC will be paid over $100 million.

20. The ESC further provided that TRC would fulfill its remediation obligations by negotiating with NYSDEC and executing "Consent Order(s) addressing each property . . . consistent with the terms and conditions" of the ESC, including performing all remedial "activities pursuant to the New York State Voluntary Cleanup Program ('VCP')."

21. In the early 1990's, New York established the VCP to address the environmental, legal and financial barriers that often hindered the redevelopment and reuse of contaminated properties. The VCP was developed to enhance private sector cleanup of "brownfields" sites by enabling parties to remediate sites using private rather than public sector funds and to reduce the

development pressures on "greenfield" sites. A "brownfields" site is generally defined as developed real property with respect to which the expansion, redevelopment or of the property may be complicated by the presence or potential presence of a hazardous substance, pollutant or contaminant. A "greenfield" site, by contrast, is land that has not previously been commercially developed.

22. New York's VCP was a cooperative approach among the NYSDEC, lenders, developers and prospective purchasers to investigate and/or remediate contaminated sites and return such sites to productive use. Under the VCP, a "volunteer" agrees to perform remedial activities pursuant to NYSDEC approved work plans and to remediate contaminated sites to levels that are protective of public health and the environment for the present or intended use of the property. Remediation under the VCP was to be carried out under the oversight of the NYSDEC, with the volunteer paying the State's oversight costs. When the volunteer completed its VCP work, a limited release from liability from NYSDEC would be provided to the volunteer. In essence, the program was designed to induce owners, and their remediation firms, to participate in the redevelopment of environmentally-challenged sites, by offering a limited release of liability from certain State regulators.

23. Under the ESC, "remediation" means:

> the investigation, feasibility study, preparation of a Site Work Action Plan, clean-up, removal, disposal, treatment (including in-situ and ex-situ) or neutralization of all Pollutants on-Site, at Off-Site Locations and with respect to Off-Site Items, in all cases to the Remediation Standards, including, but not limited to, any monitoring, operations and maintenance activities that may be required after the completion of such investigation, feasibility study, clean-up, removal, disposal, treatment or neutralization, as well as the performance of any and all obligations imposed by any Governmental Authority, including obligations imposed pursuant to the Existing Consent Order and **obligations imposed pursuant to a validly executed voluntary clean-up agreement, plan or**

> **Consent Order negotiated with a Governmental Authority or voluntary clean-up directed by an authorized representative of Governmental Authority**. (emphasis added).

24. Additionally, Section 5(r) of the ESC obligates TRC "to . . . apply for admission to the VCP." Section 5(r) provides in full with respect to TRC's obligations:

> (i) cause Site Developer to be a party to the Consent Order(s) with no obligations thereunder and (ii) obtain a Covenant Not to Sue in connection with Pollution Conditions, from the Governmental Authority exercising jurisdiction over the Site Work, for the benefit of the Site Developer, and, if possible, Client; it being acknowledged that decisions regarding Covenants Not to Sue are subject to the discretion of such Governmental Authority: (A) **apply for admission to the VCP; (B) agree to NYSDEC's standard form of consent order under the VCP (unless TRC can negotiate more favorable terms within the VCP); (C) prepare plans and other documentation as required by NYSDEC**: (D) as part of the negotiation of the Consent Order(s), request that NYSDEC deliver a Covenant Not to Sue applicable to each Developer Owner and Client; and (E) perform the Site Work in accordance with the Remedial Action Plan and perform any additional tasks required by NYSDEC and/or any other Governmental Authority with jurisdiction as a condition to obtaining such Covenant Not to Sue to the extent consistent with the Contract. (emphasis added)

25. Section 5(r) of the ESC also obligates TRC to "use Contractor Good Faith Efforts to cooperate with Client, and Site Developer . . . so as to maximize all potential benefits that could be realized pursuant to the applicable provisions of the Internal Revenue Code (26 U.S.C. §§ 1 et. seq.)."

26. "Contractor Good Faith Efforts" in Section 1(e) of the ESC "means that TRC shall perform the proposed Site Work activities and any other obligations pursuant to this Contract, as requested, except to the extent that they would [among other things] result in a material increase in the cost of the Site Work." Under such circumstances, however, the ESC provides that TRC would nonetheless perform such activities requested by ERRC "in exchange

for an undertaking by Con Edison and/or Site Developer [ERRC] to pay the additional cost of such activity."

27. FSM (now ERRC) is explicitly named as a third-party beneficiary of the ESC. As the ESC provides in Section 26, entitled "Third Party Beneficiary," "Site Developer [ERRC] shall be a third party beneficiary of this Contract." To that end, the ESC sets out numerous covenants by TRC that run directly to ERRC. For example, among other things, the ESC:

- Releases ERRC for losses and expenses regarding the pre-existing environmental conditions or arising out of the site work. ESC ¶ 3;
- Prevents TRC from imposing any deed restrictions or other institutional or engineering controls upon the Properties that ERRC acquired. ESC ¶ 5(b);
- Compels TRC to coordinate and cooperate with ERRC in planning an executing the site work. ESC ¶ 5(g);
- Imposes liability on TRC for all losses and expenses that ERRC suffers as a result of any failure to achieve Phase I completion (*i.e.*, "the completion of Phase I Work, as evidenced by issuance of Phase I Approval and completion of Demolition and Decommissioning to the delivery specifications set forth Exhibit 'H' [to the ESC]") in accordance with the schedule contemplated by the ESC. ESC ¶ 5(r); and
- Requires TRC to assist ERRC in opposing any attempt to list any of the Properties as dangerous or hazardous properties pursuant to State or Federal law. ESC ¶ 5(v).

28. At its core, the ESC was designed to ensure that the parties, upon successful remediation, would be absolved of any and all "liability under existing or ***future*** federal, state and local laws and regulations." ESC at 1 (emphasis added).

29. After the closing on the Properties, pursuant to Section 12 of the ESC, ERRC acquired additional rights, which were previously solely held by Con Edison.

***The Purchase and Sales Agreement***

30. Under the Purchase and Sales Agreement, Con Edison also entered into an agreement with an insurance company whereby the insurance company would (i) administer a

fund to pay for the remediation of the First Avenue Sites; (ii) provide Environmental Liability and Cost Cap Insurance, which would (a) cover any remediation cost overruns and (b) provide various forms of insurance coverage related to pollution conditions in the aggregate amount of $295,000,000 for a term of 30 years, which would cover liability arising from any preexisting environmental site condition (the "Insurance Policy").

31. The Purchase and Sales Agreement also provided that ERRC would be a named beneficiary of the Insurance Policy.

32. Pursuant to the Purchase and Sales Agreement, Granite State Insurance Company of 70 Pine Street, New York, New York 10270 ("Insurance Company") issued the Insurance Policy in the aggregate amount of $295,000,000 in November, 2000.

33. Also pursuant to the Purchase and Sales Agreement, upon information and belief, ERRC and Con Edison collectively placed approximately $89,500,000 into a so-called "Notional Commutation Account" to be maintained and administered by the Insurance Company to pay the remediation costs – the so-called "Site Work Costs" – upon the submission of vouchers by TRC, as provided in the Purchase and Sales Agreement, the ESC and the Insurance Policy.

34. Site Work Costs are defined in the Insurance Policy as "reasonable and necessary costs, charges and expenses ... sustained for Site Work." Site Work, in turn, is defined as "all activities and obligations sustained pursuant to and included in Remediation . . . ." Remediation in the Insurance Policy includes obligations imposed pursuant to any consent order(s), decrees or agreements or to a validly executed voluntary clean-up agreement, plan or order[s] negotiated with a governmental agency or voluntary clean-up directed by an authorized representative of a governmental agency.

35. The Insurance Policy provides for TRC, Con Edison and ERRC (then FSM) to share in any remaining proceeds left in the Commutation Account subsequent to the successful completion of the remediation work by TRC.

**The Voluntary Cleanup Order**

36. Pursuant to the above-described agreements, on or about June 27, 2001, TRC Companies, Inc. executed a Voluntary Cleanup Order ("VCO") with NYSDEC under the VCP in order to obtain regulatory closure and prepare each of the four Properties for the intended "unrestricted uses." The VCO sets out generally the commitments of TRC to remediate the Properties, all subject to NYSDEC's oversight and ultimate approval. The VCO is attached hereto as Exhibit C.

37. The VCO treats each of the four Properties as separate sites and assigns each of them a separate site number. ERRC, through its predecessor FSM, also signed the VCO as the purchaser of the Properties.

**The Brownfield Cleanup Program**

38. In October 2003, the State of New York enacted the Brownfield Cleanup Act (the "Act"), as Title 14 of Article 27 of the Environmental Conservation Law ("ECL") to replace the VCP. The purpose of the Act is "to enhance private-sector cleanups of brownfields and to reduce development pressure on 'greenfields'." In general, it provides parties with the predictability and finality they need in order to make cleaning up a contaminated property a sound investment. The primary method by which this is achieved in the Act is by broadening the liability limitation under the BCP to include not just the NYSDEC, but also other State regulatory authorities and agencies.

39. Under the Act, and consistent with general understanding, a "brownfields" site is any real property, such as the Properties, where redevelopment or re-use may be complicated by

the presence or potential presence of a hazardous waste, petroleum, pollutant or other contaminant.

40. All the Properties, except 685 First Avenue (which was substantially remediated by the Spring of 2004), fall within the Act and could be subject to its treatment upon proper and timely application by ERRC and TRC. These applications are still pending.

41. Accordingly, because the Act offers additional liability protection and significant tax incentives that are not available under the VCP, Con Edison, ERRC ***and TRC*** initially applied in March 2004 and then reapplied in June 2004 to transition the remediation of the sites from the VCP into the BCP pursuant to the Act. The June 2004 applications for the sites at issue here are attached hereto as Exhibit D.

42. The BCP is the statutory successor to the VCP and the NYSDEC anticipated that the sites in the existing VCP would transition into the new BCP. Indeed, NYSDEC published guidelines providing for just such a transition.

43. Pursuant to the Act and its guidelines, a Brownfields Cleanup Agreement ("BCA") is required for all parties who want to participate in the BCP. By executing a BCA, an "Applicant" commits to undertake certain remedial activities under NYSDEC's direct oversight.

44. NYSDEC determined, after due public notice and comment in accordance with the Act, however, that 700 and 708 First Avenue ("Greater Waterside") were eligible to participate in the BCP as a single "brownfields" site—the "Greater Waterside Site"—and that 616 First Avenue ("Kips Bay") was also eligible to participate in the BCP as a brownfields site—the "Kips Bay Site." Accordingly, in July of 2005, NYSDEC agreed to a BCA for those sites to participate in the BCP. The BCA for the Greater Waterside Site is attached hereto as Exhibit E.

45. In addition to the above-referenced broad liability limitation for the property owner that is provided by the Act following the NYSDEC's issuance of a Certificate of Completion, there are also significant tax credits available to landowners and developers like ERRC who have performed remedial activities under the BCP.

46. Specifically, brownfields redevelopment tax credits are available in the amount of 10% for individual taxpayers and 12% for businesses; this percentage is increased to 12% for individual taxpayers and 14% for businesses if the Site has been cleaned up to unrestricted conditions. These credits include the following components: (a) Site preparation credit for investigation and remediation costs; (b) Tangible property credit for costs associated with the development or redevelopment of the site, including buildings and structural components; and (c) On-Site groundwater remediation credit.

47. The tax credits are intended to offset costs associated with real property taxes, site preparation, property improvements, on-site groundwater cleanup costs and environmental insurance premiums. A Certificate of Completion stating that remediation requirements for the site have been achieved must be issued by the Commissioner of the Department of Environmental Conservation in order to trigger eligibility for the various tax credits. The tax credits start to accrue upon the signing of the BCA.

48. In July, 2005, ERRC advised Con Edison and TRC of its intent to execute BCA's for the Greater Waterside and the Kips Bay Sites to transition those properties into the BCP; Con Edison is not opposed to TRC and ERRC transitioning these sites into the BCP, subject to complying with the ESC.

49. However, because TRC is the party responsible for remediating the sites for the benefit of ERRC, it is necessary for TRC to be a party (*i.e.*, an actual signatory) to the BCA's for the Greater Waterside and Kips Bay Sites.

**TRC's Unreasonable Refusal To Execute the BCA's**

50. TRC initially expressed no unwillingness to transition the applicable sites from the VCP into the BCP, and even took steps with ERRC to further that goal for nearly a year by jointly submitting applications for the sites to participate in the BCP in March of 2004 (while always reserving its rights).

51. However, TRC has now made clear that it will not execute BCA's for the Greater Waterside and Kips Bay Sites, absent substantial, unrelated concessions from ERRC. For example, TRC has demanded as a condition for transitioning sites from the VCP to the BCP that ERRC (i) remit payment to TRC on a disputed claim; (ii) assume responsibility from TRC for building department and NYSDEC requirements for performing certain remediation work at the Greater Waterside Site; and, most importantly, (iii) provide TRC with a general release for any and all claims ERRC might have against TRC arising out of TRC's conduct in the past, other than claims for fraud or criminal conduct.

52. TRC has asserted this unreasonable position despite the fact that ERRC has repeatedly made it clear, by offering indemnification orally and in writing, that TRC will not incur any greater costs or liabilities under the BCP than would be incurred under the VCP in obtaining from NYSDEC the regulatory closure for pre-existing contamination at the Greater Waterside and Kips Bay Sites to allow for their Unencumbered Development as required by the ESC or to achieve "Phase I Completion" as that term is defined in the ESC Section 1(cc). In a letter from ERRC to TRC as recently as June 22, 2006, ERRC reiterated its willingness to

indemnify TRC for any additional, incremental expenses it might incur in transitioning the Properties into the BCP.

**<u>The Consequences of TRC's Refusal to Sign the BCA's</u>**

53. TRC's refusal to sign the BCA's will cause and already has caused ERRC to incur significant losses in that it will be prevented from obtaining significant tax credits for ongoing and future remedial work. Although it is difficult, if not impossible, to calculate exactly the amount of these potential tax credits at this time, the future losses to ERRC resulting from TRC's wrongful conduct in refusing to execute the BCA's could be very significant (many millions of dollars) as the remediation of the sites continues. TRC's refusal to sign the BCA's has already resulted in ERRC losing the 12% credits granted under the BCP for the multi-million dollar remediation work already undertaken on behalf of ERRC since August or November of 2005, the dates when the remediation work on the sites began and when the BCA for Greater Waterside was produced to ERRC by NYSDEC, respectively. These are potentially millions of dollars of credits that, had TRC signed the BCA's, could have been applied against the New York State tax liability of ERRC and its owners for prior tax years. These credits are no longer available to ERRC because those tax years (the years during which significant remediation work was undertaken) are now closed.

54. Since August of 2005, TRC has expended approximately $20,000,000 on remediation of the Kips Bay and the Greater Waterside Sites. Since November, 2005, TRC has spent over $10 million on remediation at the sites. TRC's failure and refusal to agree to the execution of a BCA has, thus, already deprived ERRC of approximately $2,400,000 to $1.2 million of New York State Tax Credits.

55. The refusal of TRC to enter into the BCP will also deprive ERRC of approximately $3,600,000 New York State Tax Credits for the remaining remediation work.

56. More importantly, TRC's refusal to enter into the BCP will also deprive ERRC from realizing very significant New York State Income Tax Credits for Capital Construction Costs, as well as other advantages associated with ERRC's participation in the BCP.

57. TRC's unilateral refusal to participate in the BCP also deprives ERRC of important protections arising from the Act in the form of complete releases from future liability to New York State, including any and all State agencies (subject to certain exceptions), as compared to more limited and narrow releases that exist under the VCP. The financial benefits of these additional releases are not susceptible to precise calculation.

**The Parties' Current Positions**

58. On January 19, 2006, a representative of ERRC personally handed the BCA for Greater Waterside to TRC Companies' new Chairman of the Board. The BCA was signed on behalf of ERRC. ERRC requested that TRC sign the BCA and return it to ERRC. To date, TRC has not executed the BCA for Greater Waterside.

59. In early-June 2006, NYSDEC sent a letter to TRC setting forth NYSDEC's determination that Phase I Completion had been achieved at the Kips Bay Site. Recently, TRC also sent a letter to NYSDEC setting forth TRC's estimation that Phase I Completion has also been completed at 708 First Avenue (one of the Waterside properties).

60. On June 22, 2006, ERRC sent a letter to TRC demanding that TRC withdraw its request for a general release by ERRC for any prior wrongful conduct on the part of TRC in exchange for TRC's agreement to sign the BCA's. A copy of the June 22, 2006 letter is attached hereto as Exhibit F. ERRC gave TRC until June 30, 2006 to notify ERRC of its agreement to transition the sites at issue into the BCP. TRC has not agreed to transition the sites to the BCP, continuing to assert its unreasonable demands, including a release for its prior conduct, which ERRC is not prepared to grant.

61. As a result of TRC's conduct, it is clear that TRC has no intention of complying with its contractual obligations to ERRC.

62. As a consequence, ERRC is compelled to seek the following relief from this Court.

**COUNT I**
*(Injunctive Relief -- Against All Defendants)*

63. Plaintiff hereby repeats and realleges the allegations contained in paragraphs 1 through 62 of the Complaint.

64. As alleged, TRC has materially breached the ESC and its duties owed to ERRC by, among other things, failing to participate in the BCP by executing BPA's for the Greater Waterside and Kips Bay Sites.

65. TRC's willful, repeated and ongoing breaches of its contractual obligations to ERRC has deprived ERRC of its ability to obtain significant tax credits and other important benefits available to participants in the BPC.

66. Despite repeated requests, TRC is ignoring its contractual obligations to ERRC by failing to negotiate in good faith towards executing BPA for the Greater Waterside and Kips Bay Sites.

67. It is essential that TRC be compelled to protect the significant benefits available to ERRC under the BCP.

68. As a result of the foregoing breaches, injunctive relief is necessary to prevent further immediate, substantial and irreparable injury to ERRC.

69. There is a substantial likelihood that ERRC will succeed on the merits of its claims.

70. ERRC is without an adequate remedy at law.

71. The benefits to ERRC from injunctive relief will substantially outweigh any potential harm to TRC.

72. If the injunctive relief is granted, TRC will merely be required to comply with its existing obligations to ERRC.

73. As a result of the foregoing, this Court should enter an injunction enjoining TRC from continuing to breach its contractual obligations to ERRC and ordering it to execute the BPA's for the Waterside and Kips Bay sites.

**COUNT II**

*(Breach of Contract -- Against All Defendants)*

74. Plaintiff hereby repeats and realleges the allegations contained in paragraphs 1 through 73 of the Complaint.

75. As discussed above, TRC's obligations under the ESC include, but are not limited to:

(a) Remediating the Properties, including satisfying any obligations imposed pursuant to executed voluntary cleanup agreements or plans with any Governmental Authority, such as the NYDEC;

(b) Applying for and participating in the VCP (the voluntary cleanup program under NYSDEC administration that preceded the BPC); and

(c) Using TRC's best efforts to maximize any and all tax benefits available for ERRC.

76. TRC has not fulfilled these contractual obligations under the ESC.

77. Additionally, under New York law (applicable here under Section 19 of the ESC), there is an implied covenant of good faith and fair dealing that applies to all contracts during the performance of the terms of the contract.

78. TRC has failed to act in good faith and has not dealt fairly with ERRC by failing to participate in the BCP and sign BCA's for the Greater Waterside and Kips Bay Sites.

79. TRC has failed to act in good faith and has not dealt fairly with ERRC by unilaterally calling off discussions relating to transitioning the Greater Waterside and Kips Bay Sites into the BCP unless ERRC pays TRC additional sums of money and grants other concessions to TRC totally unrelated to the transition from the VCP into the BCP.

80. TRC's lack of good faith and refusal to deal fairly with ERRC has already injured ERRC and will continue to harm ERRC in that ERRC will not be able to enjoy significant tax credits and other benefits under the BCP unless TRC cooperates with ERRC by signing BCA's for the applicable sites.

81. Plaintiff seeks, among other things, an Order requiring TRC's specific performance of its obligations under the ESC. If Plaintiff's request for specific performance is denied or becomes moot with the passage of time (with the remediation work having been completed or substantially completed during the pendency of this litigation), Plaintiff reserves the right to seek damages from TRC in the amount equal to no less than the amount of various tax credits it would have received by participating in the BCP.

82. Plaintiff also seeks substantial damages resulting from TRC's breach of contract in the amount equal to the significant dollar tax credits already lost for prior tax years due to TRC's refusal to sign the BCA's. The precise amount of the damages will be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in its favor and against TRC as follows:

(a) on the first claim for relief, a judgment awarding Plaintiff injunctive relief and enjoining TRC from continuing to breach its contractual obligations to Plaintiff;

(b) on the second claim for relief, a judgment, among other things, requiring TRC's specific performance of its obligations under the ESC, as well as awarding

damages to ERRC for millions of dollars worth of tax credits already lost for those tax years that have already concluded or will conclude during which remediation work was undertaken at the Greater Waterside and Kips Bay Sites and TRC refused to sign the BCA's, as well as other tax credits available to ERRC under the BCP;

(c) Plaintiff's costs, disbursements and attorney's fees in connection with this action; and

(d) such equitable, other and further relief as this Court deems just and proper, including money damages in an amount to be established at trial on Plaintiff's second claim for relief should this Court deny Plaintiff's request for specific performance or other injunctive relief, or if specific relief cannot be granted due to the passage of time or some other reason.

Dated: New York, New York
July 18, 2006

Respectfully submitted,

MAYER, BROWN, ROWE & MAW LLP
Richard Ben-Veniste (RB-2574)
Richard A. Spehr (RS-8130)
Ryan P. Farley (RF-6984)

1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for plaintiff East River Realty Company LLC*