6.3.  Unless and until payment of the Developer Call Price and/or delivery of the Call Date L/C has occurred with respect to all Properties, Developer shall not agree with any Government Entity or Outside Party to amend or revise the Proposed Rezoning (or any application to obtain the Proposed Rezoning) without Con Edison's consent if the effect of such agreement is to reduce the aggregate Rezoned Price which would be payable by Developer hereunder below the Aggregate Threshold Amount.

6.4.  After signing this Agreement, Con Edison shall undertake, at Con Edison's expense, subject to Section 6.5, all actions necessary or appropriate to obtain PSC Approval. Such actions shall include, among other things, making all necessary filings with Government Entities; attending and making presentations at meetings and/or hearings with Government Entities; engaging and supervising consultants of appropriate expertise; consulting with public officials and community groups, etc. While Con Edison cannot guarantee the result, Con Edison agrees to use Con Edison's best efforts for such purpose.  In this Agreement, "PSC Matter" means any matter, subject, activity, or thing in connection with the proposed PSC Approval, any aspect thereof, or any matter reasonably relating thereto (including, for example, the activities described above). Con Edison shall promptly give Developer copies of material correspondence, governmental filings, and other documents and other materials in connection with any PSC Matter, delivered by Con Edison to, or received by Con Edison, from any Government Entity or Outside Party.  Developer and Developer's officers, representatives, and counsel shall be invited to attend all meetings between Con Edison and any Government Entity or Outside Party in connection with any PSC Matter other than informal meetings (although such attendance shall not be required unless specifically so indicated by Con Edison).  Con Edison shall report to Developer as to topics discussed at any informal meeting.  Con Edison shall give notice to Developer (the "PSC Approval Notice") after the PSC Approval. Con Edison's obligations under this Section shall continue until the earlier of (a) PSC Approval; (b) the Outside Date; or (c) termination of this Agreement.

6.5.  Con Edison and Developer shall cooperate and consult regularly with each other to coordinate their respective efforts with respect to the Proposed Rezoning and the PSC Approval.  Con Edison agrees to sign upon request applications and other documents required to be signed by the fee owner of the Property in connection with the Rezoning, without responsibility or liability to Developer or others for the substantive outcome of such applications or other documents.  Developer agrees to sign upon request applications and other documents required to be signed by Developer, and to furnish upon request all information required by the PSC, in connection with the PSC Approval, without responsibility or liability to Con Edison or others for the substantive outcome of such applications or other documents.  Although each will pay the Fees-And-Costs of their respective Consultants, Developer shall pay two-thirds of the cost and Con Edison shall pay one-third (not to exceed $500,000) of the cost of all environmental impact statements to be prepared by SEQRA Consultant (including environmental assessment forms and scoping documents) in connection with the Proposed Rezoning and the PSC Approval.  For purposes of Sections 6.2 and 6.4, the parties' agreement to use their best efforts to achieve the intended purpose is meant as an expression of their seriousness and *bona fides* but neither party shall have liability to the other in damages or otherwise by reason of failure to achieve their intended purpose or otherwise to comply with the requirements of Sections 6.2 or 6.4; except, however, that if Developer fails (i) to engage its master planning architect or to make Developer's initial ULURP filing on or before the respective milestone date

specified for the particular action in Schedule "4" hereto; or (ii) to file Developer's environmental impact statement with the lead agency prior to the applicable milestone date specified in Schedule "4" hereto (which shall be extended day for day if failure to complete by such milestone date is due to delays by Allee, King, Rosen & Fleming in submitting a draft or final environmental assessment form for the PSC Approval); then Developer shall be responsible for payment of all SEQRA Consultant fees (and Developer shall promptly reimburse Con Edison for all amounts previously paid by Con Edison for SEQRA Consultant's services).

6.6.  If any Government Entity or other Person commences a Legal Proceeding against Developer and/or Con Edison in connection with any Rezoning Matter, and/or PSC Matter, Developer and Con Edison shall cooperate to coordinate their defense against such Legal Proceeding to the extent that their interests coincide, although each shall be represented by separate counsel and each shall pay its own Fees-And-Costs incurred with respect to such Legal Proceeding.

6.7.  Within 15 days after the Rezoning Approval Date, Developer shall give notice to Con Edison and Con Edison may give notice to Developer (the "Rezoning Notice") showing such party's computation of the Rezoned Price for the affected Property.  Within 30 days after the Rezoning Approval Date: (a) the Closing shall occur for the respective Property (subject to the terms of this Agreement); or (b) if a GMV Closing or Developer Call Closing has previously occurred, Developer shall pay Con Edison the Rezoned Price minus the GMV or Developer Call Price previously paid for the Property as set forth in Article 3.

6.8.  Developer will give notice to Con Edison (an "As-Built Amount Notice") showing Developer's good faith estimate of the As-Built Amount for any Development on a Property if known on the Rezoning Approval Date for such Property (with plans as then available); and Developer shall pay such As-Built Amount to Con Edison when the Rezoned Price is payable under Section 6.7.  Thereafter, as each Development is constructed on the Property, Developer shall pay to Con Edison the As-Built Amount—if any—due (with credit for any prior payments) with respect to such Development within 30 days after issuance of a temporary certificate of occupancy for the particular Development (or, if Developer has previously overpaid the As-Built Amount with respect to the particular Development, Con Edison shall refund the amount of such overpayment within 30 days after notice from Developer explaining the amount of the overpayment, with interest at the Developer Interest Rate from the date of payment).  Developer shall advise Con Edison at least quarterly as to the status of the actual construction of the Developments on the Properties and shall give Con Edison notice (also an "As-Built Notice") with a copy of the temporary certificate of occupancy when such certificate is issued for any part of such Development.  Con Edison may also give Developer notice when Con Edison believes any temporary certificate of occupancy has been issued.  If the As-Built Amount for a Property is not paid in full at the Closing of such Property, Developer shall deliver to Con Edison an As-Built Amount Guaranty in the form attached as Exhibit "J" hereto from each Developer Principal guaranteeing payment of the As-Built Amount for such Property as and when due and payable pursuant to this Agreement (the "As-Built Amount Guaranty").  If either Developer or Con Edison fails to pay within the respective 30 day period an amount properly due to the other party under this Section, the payor shall pay interest on such amount from the due date at the Developer Interest Rate.

6.9. If Con Edison disputes Developer's computation of the Rezoned Price or the As-Built Amount, respectively, for any Property, Con Edison may give notice (a "Dispute Notice") to Developer within 21 days after Con Edison has received, as applicable, the Rezoning Notice for such Property or the As-Built Notice for such Property (or Con Edison has given Developer notice that a temporary certificate of occupancy has been issued for a Development on a Property). If the parties do not resolve their dispute by agreement in writing within 15 days after Con Edison gives a Dispute Notice concerning the Rezoned Price or the As-Built Amount, either party may invoke the dispute resolution procedures of this Section and Section 6.10 by notice to the other party. Within 15 days after submission of the dispute to the FAR Arbitrator (taking into account, if applicable, any time needed for appointment of the FAR Arbitrator by the AAA), each party may submit to the FAR Arbitrator any briefs, analyses, plans, graphic materials, or other documents that such party deems material or relevant to its position. Within 10 days after such submissions, the FAR Arbitrator shall hear oral argument, with both parties present; and within 10 days thereafter the FAR Arbitrator shall render a reasoned written decision specifying his computation of the Rezoned Price or the As-Built Amount, as applicable; and such decision shall be conclusive and binding on the parties as the decision of an arbitrator under the CPLR. Each party shall pay fifty percent (50%) of the fees and charges of the FAR Arbitrator. If necessary, the respective Closing or other due date for the particular Rezoned Price or As-Built Amount shall be postponed to allow the time periods specified in this Section, subject to Section 6.10. (Where not inconsistent with this Section, the AAA rules for expedited arbitration shall apply.)

6.10. If Con Edison has given a Dispute Notice concerning Developer's computation of the Rezoned Price or the As-Built amount for any Property and if the parties have not agreed on (or the FAR Arbitrator has not determined) the applicable amount within 60 days after the giving of a Dispute Notice under Section 6.9 (whatever the reason for the lack of resolution), time being of the essence, within 15 days thereafter Developer shall pay to Con Edison the full amount of the Rezoned Price and the As-Built Amount including the amounts in dispute; and, if applicable, the Closing shall occur; and if the FAR Arbitrator thereafter determines that Developer has made an overpayment on account of either such Rezoned Price or As-Built Amount, Con Edison shall refund such overpayment to Developer within 15 days after the FAR Arbitrator's decision, with interest at the Developer Interest Rate.

6.11. Because both Developer and Con Edison desire to achieve Developments of superior design and architectural quality on the Properties, Developer agrees that it will hold a competition at its expense among up to 10 nationally and/or internationally renowned firms specializing in architecture and/or urban planning to select the master planner for future development on the Properties. Developer will consult regularly with Con Edison as to the firms to be interviewed or selected for this purpose and subsequently, also, the architects to be selected for the design of each Development on a Property (although selection of all such architects and other consultants shall be in Developer's discretion).

6.12. With respect to any Property as to which no GMV Closing or Developer Call Closing has yet occurred (and/or the Call Date L/C has not been delivered), Con Edison shall have the right (at its election) to terminate this Agreement as to any Property or all Properties upon notice to Developer given within 30 days following the Rezoning Approval Date, if the Floor Area obtained in the Rezoning would result in a Rezoned Price for all Properties of less

than the Aggregate Threshold Amount. Within 30 days after delivery to Developer of such termination notice, provided that the Developer Call Date has not yet passed, Developer may elect on notice to Con Edison to exercise the Developer Call Option (time being of the essence with respect to such notice) with respect to all Properties covered by the termination notice, in which case the Developer Call Date shall be deemed to be the date that is 30 days after the date of the Call Notice. Upon Developer's election to exercise the Developer Call Option pursuant to the preceding sentence, the provisions of Section 3.4 and the other applicable provisions of this Agreement shall apply; provided, however, that notwithstanding Section 3.5, the failure of Developer to deliver the Call Date L/C and/or close and pay the Developer Call Price when required shall be a Developer Event of Default. If Con Edison terminates the Agreement pursuant to this Section, the First L/C, the Second L/C, the Third L/C (and any portion of the RDE Deposit allocable to Properties not yet deeded to Developer, with interest at the CE Interest Rate) and the Rezoning L/C, as applicable, shall be reduced as provided in Section 4.5 or returned to Developer, as applicable; and thereafter neither party shall have any liability to the other under this Agreement with respect to the applicable Properties except as specified in Articles 8, 22 (as to any Developer Event of Default existing prior to such date) and 24. If and to the extent that Con Edison does not exercise its rights of termination under this Section, this Agreement shall remain in effect.

6.13. At the GMV Closing for any Property, to secure Developer's obligation to pay the Rezoned Price if, as, and when due under this Agreement, Developer and the respective Title LLC shall execute and/or deliver to Con Edison the Rezoning Note, the Rezoning L/C, the Rezoning L/C Agreement, the Rezoning Pledge Agreement, and the Rezoning Mortgage for such Property. The indebtedness under each Rezoning Note shall be the maximum Rezoned Price (i.e., computed on the basis of a deemed FAR of 12 and the Lot Area specified in Section 3.9) due and payable to Con Edison upon the Rezoning of the Property (less the GMV previously paid as to such Property). At the Closing, Developer shall pay all mortgage recording taxes due for the recording of the respective Rezoning Mortgage and also the premiums charged by the Title Insurer(s) for the issuance to Con Edison of a mortgagee policy of title insurance insuring Con Edison's lien under the Rezoning Mortgage. The Rezoning Mortgage shall be subordinate to the First Mortgage of each Property granted by Developer or the respective Title LLC to secure a loan of all or part of the GMV for such Property (a "Land Acquisition Loan"), upon terms and conditions as more particularly set forth in such Rezoning Mortgage. The Rezoning Pledge Agreement shall be subordinate to a pledge of the equity in Developer or the respective Title LLC granted by Developer to secure the same Land Acquisition Loan, upon terms and conditions as more particularly set forth in such Rezoning Pledge Agreement. (Although Developer and the applicable Title LLC may not grant more than one First Mortgage and First Pledge for each Property, the respective lender(s) thereunder shall be permitted to grant to one or more Persons a participation interest in each such instrument and the underlying Land Acquisition Loan, or to syndicate such Land Acquisition Loan). Developer and/or the respective Title LLC shall pay, keep, and perform all obligations to be paid, kept, and performed under the Rezoning Collateral. For the avoidance of doubt, there will be a single Rezoning Mortgage securing twenty five million dollars ($25,000,000) in the aggregate as to all Properties which will be granted by Developer and the respective Title LLC against each and every Property. Upon receipt of: (i) the Rezoned Price for any Property or (ii) the Developer Call Price and the Developer Call L/C for the Properties, as applicable, Con Edison shall sign instruments

necessary to assign without recourse or terminate and discharge, and shall return, as applicable, the Rezoning Collateral for such Property or Properties to Developer.

6.14.    In this Agreement, "Title LLC" means a limited liability company of which Developer owns directly or indirectly all (100% of) the membership interests, subject to Article 26, and which satisfies the "single purpose entity" requirements set forth in Schedule "5" hereto. Any references to, or obligations of, Developer in this Agreement shall be deemed to include each "Title LLC"; and each Title LLC shall be subject to the terms of this Agreement and bound by this Agreement to the same extent as Developer. With respect to each GMV Closing, Developer shall cause a Title LLC to take title pursuant to this Agreement in place of Developer; and Developer shall cause each Title LLC to comply with the single purpose entity requirements of Schedule "5" hereto until Con Edison has received the full Purchase Price pursuant to Section 3.1(b) for the respective Property, or Con Edison has received payment of the Developer Call Price (and/or delivery of the Call Price L/C) or the Outside Date Call Price with respect to all Properties, or the Outside Date has occurred.

6.15    At the Developer Call Closing, to secure Developer's obligation to pay any portion of the Rezoned Price in excess of the Developer Call Price for the applicable Property if, as, and when due under this Agreement, Developer shall deliver to Con Edison the Developer Call L/C. If the Rezoned Price has not become due as of the Outside Date, Con Edison shall promptly return the Developer Call L/C to Developer.

ARTICLE 7. _____    Title to the Properties; Possession

7.1. Developer will not be required to accept title to any Property subject to any Encumbrance other than the Permitted Encumbrances. In this Agreement, "Title Defect" means any Encumbrance other than a Permitted Encumbrance.

7.2. On or before a Closing Date, Developer may give Con Edison notice of a Title Defect with respect to the Property or Properties which are the subjects of such Closing. If Developer gives notice to Con Edison of any such Title Defect, Con Edison may adjourn the Closing (and the Outside Date, if applicable) for a period or periods not exceeding 60 days in the aggregate to remove the Title Defect(s) specified in Developer's notice. If Con Edison is unable (or unwilling), subject to Section 7.3, to remove such Title Defect(s) before such period expires, and if Developer has not agreed in writing to accept such title as Con Edison is then able to convey, this Agreement shall terminate with respect to the particular Property. Notwithstanding the foregoing, if the applicable Title Defect is a judgment or judgments that Con Edison is not required to remove pursuant to Section 7.3(b) and is not willing to Remove, Con Edison shall not be entitled to terminate this Agreement as to such Property before November 15, 2006 without the prior written consent of Developer; it being understood that during such period Con Edison shall not be required to Remove or endeavor to Remove such Title Defect, but that if Con Edison Removes such Title Defect prior to November 15, 2006, Con Edison shall be required to convey and Developer shall be required to purchase such Property, subject to the terms of this Agreement.

7.3. If Con Edison receives notice under Section 7.2 of a Title Defect which is a lien for payment of money only, Con Edison agrees as follows:

    (a)    to Remove mechanics' liens which are asserted against one or more of the Properties other than any liens asserted against a Property by, through, or under the RDE Contractor; and/or

    (b)    to Remove judgments for liquidated sums of money asserted against the Property which is the subject of the respective Closing, provided that the liquidated sums evidenced by all such judgments do not exceed thirty seven million five hundred thousand dollars ($37,500,000) in the aggregate for the first two Properties to be conveyed and provided further that the liquidated sums evidenced by all such judgments for all Properties do not exceed seventy-five million dollars ($75,000,000) in the aggregate; and/or

    (c)    to Remove any amounts due the City of New York for violations of law previously asserted against a Property before the respective Closing if those amounts (i) would be collectable as a lien or other obligation against the Property after conveyance by Con Edison and (ii) would not be cancelled as the result of the demolition of improvements on the Property in the RDE or the construction of a Development on the Property, provided that the aggregate of all such amounts for all Properties does not exceed five hundred thousand dollars ($500,000).

In this Article, "Remove" means either (x) to remove and discharge of record by payment, bonding, or otherwise or (y) to give the Title Insurer an indemnity sufficient to induce the Title Insurer to insure title free and clear of the particular lien or other charge.

7.4  With respect to each Property which is the subject of a Closing, on or before the Closing Date, Con Edison shall:

    (a)    pay all real property taxes due prior to a Closing, subject to Article 13;

    (b)    Remove any Mortgage against such Property;

    (c)    terminate (or otherwise cause to be terminated and surrendered) any Lease on such Property (other than the Waterside Lease); and

    (d)    terminate (or otherwise cause to be terminated and surrendered) any easement which is not a Permitted Encumbrance and has been granted in violation of Section 7.9.

7.5. Except as specified in Sections 7.3 and 7.4, and notwithstanding any other provision of this Agreement (express or implied), Con Edison shall have no obligation whatsoever to cure, correct, satisfy, or discharge any Title Defect.

7.6. Subject to the foregoing and otherwise subject to the terms of this Agreement, Con Edison shall deliver possession of each Property to Developer at the Closing of such Property, subject to the Permitted Encumbrances.

7.7. For the avoidance of doubt, the activities of the RDE Contractor on any Property and any agreements, covenants, orders, judgments or decrees, institutional controls, engineering controls, or other Encumbrances signed, entered into, or accepted by Con Edison, the RDE Contractor, the Exit Insurer and/or any Government Entity pursuant to and in accordance with the RDE Contract and/or the Exit Insurance, and any mechanic's liens asserted against a Property by, through, or under the RDE Contractor shall be "Permitted Encumbrances" for purposes of this Agreement.

7.8. Con Edison may give Developer notice (each, a "Title Report Notice") on or before January 15 of each year after the date of this Agreement and before the Closing of title to each Property to request that Developer give Con Edison notice of any Title Defect which has come into existence against the respective Property since the prior January 15th (or since the signing of this Agreement prior to January 15, 2001, as applicable). Developer shall give Con Edison notice within 30 days thereafter of any such Title Defect, which shall be deemed a notice given under Section 7.2 with respect to the particular Property. If Con Edison delivers a Title Report Notice, Developer's failure to give a notice under this Section as to a Title Defect which arose prior to the applicable January 15th and was not the subject of a previous notice under this Section shall be deemed acceptance and a waiver of the particular Title Defect (but only if such Title Defect is a lien which cannot be discharged by the payment of money, whether or not Con Edison must Remove same pursuant to Section 7.3 or 7.4), which shall then be deemed a Permitted Encumbrance.

7.9. If Con Edison is requested by third parties to grant utility or access easements across any Property and in Con Edison's opinion it is necessary or advisable to grant such easements, Con Edison shall notify Developer that such easements are necessary or advisable, and Con Edison and Developer shall work together in good faith to agree upon the location of and terms of such easements to the end that such easements (i) do not interfere with the planned Developments on the applicable Property or Properties, and (ii) do not violate the applicable provisions of the RDE Contract or require extra payments under the RDE Contract. Upon Developer's written approval of any such easement (such approval not to be unreasonably withheld subject to clauses (i) and (ii) of the preceding sentence), such easement shall be deemed a Permitted Encumbrance for purposes of this Agreement. (Notwithstanding the foregoing, it is understood and agreed that Con Edison shall not be required to obtain Developer's approval to any easement which by its terms is terminated on or prior to the Closing Date with respect to such Property, provided that such easements shall not be Permitted Encumbrances.)

ARTICLE 8.          Condition of the Properties; Right to Remove Fixtures and Equipment

8.1. Except as set forth in Article 9 and in all cases subject to Section 10.1(i): (a) Developer agrees that each Property is to be conveyed "as is, where is"—i.e., in the physical condition existing on the Closing Date; (b) for the avoidance of doubt, Developer accepts the risk of all change, deterioration or destruction of every kind as to each Property and the improvements on such Property from and after the date of this Agreement, and Developer agrees that Con Edison has no responsibility to maintain or operate the Property in any condition whatsoever by reason of this Agreement; and (c) Developer acknowledges that Developer will

rely on the results of Developer's own inspections and observations of the Property regarding the physical and environmental condition thereof. Con Edison makes (and has made) no representations or warranties, direct or indirect, express or implied, oral or written, of habitability, merchantability, usability, fitness for a particular purpose, environmental condition, presence or absence of Hazardous Substances, profitability, compliance with laws, or of any other kind with respect to any Property or otherwise concerning the subject matter of this Agreement. Developer also acknowledges that no agent or other representative of Con Edison has made any such representations or warranties to Developer.

8.2. Developer shall have the right to make non-invasive inspections, investigations and tests on the Properties, and Con Edison and its representatives shall cooperate reasonably in such matters; provided, however, that such activities shall be subject to (and not interfere with) site control and other rights of the RDE Contractor and the Exit Insurer under their respective agreements and shall not interfere with the operations of Con Edison, the RDE Contractor, or the Exit Insurer. "Non-invasive" means that such inspections, investigations, and tests shall not involve digging, boring, or other activities which involve physical invasion, excavation, disturbance, or penetration of a Property. For such purposes, Con Edison shall provide reasonable access to any Property to Developer and Developer's contractors, agents and representatives during normal business hours on Business Days subject to Con Edison's standard operating procedures and requirements (including its health and safety procedures) and subject to the rights of the RDE Contractor and the Exit Insurer under their respective agreements. Before entering the Property to do any testing or inspections, Developer shall give Con Edison certificate(s) of insurance evidencing that Developer has in effect commercial general liability insurance, written on the "occurrence" basis, with minimum coverage limits of at least $10,000,000 written by insurers reasonably acceptable to Con Edison and licensed or authorized to do business in the State of New York with a Best's rating of A or better, that cover Developer's obligations under this Section (although such coverages are not intended to limit Developer's obligation under this Section). Developer agrees to indemnify Con Edison and the Con Edison Indemnitees from and against all loss, cost, expense, damage, charge, claim or liability (including Fees-And-Costs) which they may suffer, incur, or pay out by reason of the acts or omissions of Developer, its contractors, agents and representatives on the Property pursuant to this Section. This Section shall survive any termination of this Agreement. If the Closing does not occur with respect to a particular Property, Developer also agrees to return the Property free of debris caused by Developer and with any unsafe conditions created by Developer covered securely or otherwise made safe or repaired. For the avoidance of doubt, Developer agrees that this Section is intended for Developer's planning and convenience only and shall not be construed to give Developer any right to terminate Developer's obligations under this Agreement based on any conditions or other physical matters affecting any Property (and whether or not any Property is conveyed before or after any other Property).

8.3. Before the Closing Date, subject to the rights and time schedule of the RDE Contractor and the Exit Insurer, Con Edison may (but shall not be obligated to) remove from each Property, at Con Edison's expense, any and all fixtures, equipment, and other personal property of any kind whatsoever, whether existing on the date of this Agreement or later installed or located on the respective Property. Any fixtures, equipment, and personal property in or on a particular Property and not removed by Con Edison before the Closing Date for such Property (or, if earlier, the date when the RDE Contractor assumes control of, or demolishes, the same)

shall be deemed abandoned, and Con Edison shall have no obligation to remove the same. Moreover, Con Edison shall have no obligation or liability for the condition of a Property resulting from the removal of—or failure to remove—any such fixtures, equipment, or personal property.

8.4. Subject to Article 9 and Section 10.1(i), Con Edison will have no liability or obligation with respect to demolition of existing structures or excavation on any Property.

8.5. This Article supplements (and is not intended to limit) Article 9.

ARTICLE 9.                                                                    RDE Strategy

9.1. Con Edison has advised Developer that the Properties have environmental histories and that Hazardous Substances are now (or in the past have been) present on some or all of the Properties. Before the signing of this Agreement, Con Edison has given Developer reports and materials of various types pertaining to Hazardous Substances on the Properties. Con Edison does not represent or warrant that any such reports or other materials identify any or all Hazardous Substances on any or all of the Properties or are accurate or complete; and Developer agrees that Con Edison shall have no responsibility for any such reports and materials.

9.2. Simultaneously herewith, Con Edison has entered into an agreement (the "RDE Contract") with TRC Engineers, Inc. and TRC Environmental Corporation (together, the "RDE Contractor") to perform the RDE on each Property, as more particularly set forth in the RDE Contract. References to the RDE Contractor in this Agreement shall be deemed to include the subcontractors of the RDE Contractor.

9.3. Simultaneously herewith, Con Edison has obtained a policy or policies of insurance described as "Consolidated Edison Companies of New York, Inc. First Avenue Properties Insurance Policy" (the "Exit Insurance") from Granite State Insurance Company (the "Exit Insurer") covering, with respect to each Property: (a) direct payment of costs of the RDE Contract and (b) various liabilities asserted against Con Edison, Developer, and the other Persons insured under such policy by reason of or relating to Hazardous Substances with respect to the Properties, all as more particularly set forth in the Exit Insurance. The Exit Insurance names Developer as a named insured. Pursuant to the Exit Insurance, the Exit Insurer has assumed responsibility for all payments due to the RDE Contractor and has guaranteed performance by the RDE Contractor of the RDE Contractor's obligations, under the RDE Contract. The parties have paid, and shall pay, the costs of the RDE Contract and the Exit Insurance as follows:

(a) on the signing of this Agreement: (i) the RDE Deposit from Developer has been paid to the RDE Contractor, subject to Section 9.6 below; (ii) Con Edison has paid thirty five million dollars ($35,000,000) to the RDE Contractor; and (iii) each of Con Edison and Developer has paid six million seven hundred fifty thousand dollars ($6,750,000) to the Exit Insurer towards the insurance premiums for the Exit Insurance;

(b) after the signing of this Agreement, Con Edison will pay the Exit Insurer three million six hundred thirty three thousand dollars ($3,633,000) if asbestos is found in certain stacks at Waterside; and

(c) after the signing of this Agreement, Developer and Con Edison will share the costs of the "ERDE Work" (as described in Article 3 of the First Amendment) relating to Waterside upon the terms and conditions set forth in the First Amendment.

Also, the parties agree that Con Edison shall receive any refunds from the RDE Contractor or the Exit Insurer relating to so-called "deducts" under Exhibit I to the RDE Contract.

9.4.  Simultaneously herewith, also, TRC Companies, Inc., the parent corporation of the RDE Contractor has executed and delivered the RDE Contract to establish its joint and several liability with the RDE Contractor for the performance by the RDE Contractor of the RDE Contractor's obligations under the RDE Contract.

9.5. Developer: (a) acknowledges that Developer has reviewed and participated in the negotiation of the RDE Contract, the Exit Insurance, and the RDE Parent Indemnity; (b) agrees subject to 10.1(i), that Con Edison has no responsibility for the performance of the work described in the RDE Contract, any other remediation, demolition or excavation work with respect to the Properties, or the compliance of the Properties with Environmental Laws (although Con Edison is responsible under the RDE Contract to turn over the Properties to the RDE Contractor as and when required under the RDE Contract); and (c) waives and releases all rights, claims and actions of every kind or matter whatsoever which Developer and/or its successors, assigns and/or legal representatives shall or may have against Con Edison and the Con Edison Indemnitees, at law or in equity, with respect to or in connection with Hazardous Substances, whether on the Properties or off-site, and whether arising or accruing before, on or after the date hereof, subject to Section 9.7 and Article 6 of the First Amendment.

9.6. On the signing of this Agreement, Con Edison has received from Developer and paid to the RDE Contractor and the Exit Insurer the RDE Deposit to be applied to the amounts due and payable to the RDE Contractor and the Exit Insurer with respect to the RDE Contract and/or the Exit Insurance. The RDE Deposit shall be allocated to the respective Properties as set forth in the definition of the RDE Deposit. If this Agreement terminates as to any Property (other than by reason of a Developer Event of Default), Con Edison shall repay to Developer the portion of the RDE Deposit allocable to such Property, together with interest from the date of this Agreement computed at the CE Interest Rate (but at the Developer Interest Rate if the Agreement terminates under Section 22.4). However, the balance of the RDE Deposit shall remain with the RDE Contractor or the Exit Insurer, as applicable, subject to the terms and conditions of this Agreement (including Section 22.2) and of the RDE Contract and the Exit Insurance with respect to all Properties as to which this Agreement remains in effect.

9.7  The First Amendment makes provision for sharing of responsibility for certain liabilities relating to Hazardous Substances if and to the extent not covered by the RDE Contract and/or the Exit Insurance.

Developer Conditions

ARTICLE 10.

10.1.    Developer's obligation to perform and complete Developer's obligations at the Closing of the respective purchase and sale of each Property under this Agreement shall be subject to satisfaction of each of the following conditions at or before the particular Closing:

(a)    Title to the respective Property shall be subject to no Encumbrances other than Permitted Encumbrances (but a failure of this condition as to one Property shall not be a failure as to any other Property).

(b)    Con Edison shall have executed and delivered to Developer the Deed for the particular Property and all other Closing Instruments required to be executed and delivered by Con Edison at or prior to the Closing.

(c)    The respective Property shall be vacant and free of Leases (other than the Waterside Lease).

(d)    All representations and warranties of Con Edison in this Agreement shall be true, correct and complete in all material respects as of the Closing Date.

(e)    No Con Edison Event of Default shall have occurred and be continuing as of the Closing Date.

(f)    Except as to a Developer Call Closing, there shall have occurred no Material Condemnation under Article 19 with respect to the particular Property.

(g)    The PSC Approval applicable to, or required for, the particular transaction shall have been issued.

(h)    There shall be no Service Contracts in effect as of the Closing Date with respect to the Property.

(i)    Except as to a Developer Call Closing, RDE Completion shall have occurred with respect to the particular Property.

(j)    Except as to (A) any GMV Closing, or (B) the Developer Call Closing or (C) the Outside Date Closing, the Rezoning Approval Date shall have occurred for each and every Property.

(k)    There shall be no Injunction restraining the Closing as to the particular Property.

(l)    Any other conditions to Developer's obligations as to such Property which are set forth elsewhere in this Agreement shall have been satisfied.

34

Con Edison Conditions

ARTICLE 11.

11.1.    Con Edison's obligation to perform and complete Con Edison's obligations at the Closing of the respective Property under this Agreement shall be subject to satisfaction of each of the following conditions at or before Closing:

(a)    Developer shall have paid the Purchase Price then due for such Property and all other Properties as to which the Purchase Price is then due.

(b)    If the Rezoning Approval Date has not yet occurred, Developer shall have delivered to Con Edison: (i) for a GMV Closing, the Rezoning Note, the Rezoning L/C, the Rezoning L/C Agreement, the Rezoning Pledge Agreement, and the Rezoning Mortgage; and no Event of Default (as defined therein) shall have occurred (and be continuing as of the Closing Date) under any Rezoning Collateral, with respect to any Property; or, (ii) for a Developer Call Closing, the Call Date L/C (for any Property for which the Developer Call Price has not been paid) and the Developer Call L/C.

(c)    The Developer shall have executed and delivered to Con Edison all other Closing Instruments required to be executed and delivered by Developer at or prior to the Closing.

(d)    No Developer Event of Default shall have occurred and be continuing as of the Closing Date.

(e)    All representations and warranties of Developer in this Agreement shall be true, correct, and complete in all material respects as of the date(s) when made or deemed to be made and as of the Closing Date.

(f)    [omitted]

(g)    [omitted]

(h)    Except as to (A) any GMV Closing or (B) the Developer Call Closing or (C) the Outside Date Closing, the Rezoning Approval Date shall have occurred for each and every Property. For this purpose, Rezoning shall not be deemed to include the amendment of the BSA Special Permit (meaning that Con Edison shall not have the right to require that amendment of the BSA Special Permit shall have occurred by the Rezoning Approval Date).

(i)    Developer shall have executed and delivered the Future Rezoning Covenant to Con Edison.

(j)    The PSC Approval required for the particular transaction shall have been issued.

(k)    The Board of Trustees of Con Edison shall have adopted a resolution approving this Agreement and the transactions contemplated hereunder.

(l) There shall have occurred no bankruptcy, insolvency or other material adverse change in the financial condition of Developer or any Developer Principal which would prevent or materially impair Developer from performing Developer's obligations under this Agreement. (If any such event occurs as to a Developer Principal, Developer may satisfy this condition by effecting the withdrawal of such Developer Principal and the substitution in its stead of another Developer Principal (or of financial security) reasonably satisfactory to Con Edison.)

(m) There shall be no Injunction restraining the Closing as to the particular Property.

(n) Any other conditions to Con Edison's obligations which are set forth elsewhere in this Agreement shall have been satisfied.

ARTICLE 12.                                                    Waiver of Conditions

12.1. Con Edison shall have the right to waive compliance by Developer with any condition set forth in Article 11 other than in Section 11.1(h), (j), and (k). For the avoidance of doubt, Con Edison may waive any such condition or conditions with respect to one or more (or all) of the Properties.

12.2. Developer shall have the right to waive compliance by Con Edison with any condition set forth in Article 10 other than in Section 10.1(g). (For the avoidance of doubt, this means that Developer may waive the requirement that amendment of the BSA Special permit shall have occurred as part of the Rezoning by the Rezoning Approval Date for purposes of Section 10.1(j).)

12.3. Any waiver under Section 12.1 or 12.2 must be in writing and must refer specifically to the condition being waived. However, if the respective Closing occurs, the respective conditions in Articles 10 and 11 shall be deemed to have been satisfied as to the particular Property unless specified to the contrary in writing before such Closing; provided, however, that neither party shall be released from any obligations which survive the Closing.

12.4. If, before the Closing Date, Developer becomes aware that any of Developer's representations and warranties in this Agreement are untrue, incorrect, or incomplete in any material respect, Developer shall give notice to Con Edison as promptly as practicable. Thereafter, Developer shall have the right to cure or correct the problem prior to the Closing Date.

12.5. If, before the Closing Date, Con Edison becomes aware that any of Con Edison's representations and warranties in this Agreement are untrue, incorrect, or incomplete in any material respect, Con Edison shall give notice to Developer as promptly as practicable. Thereafter, Con Edison shall have the right to cure or correct the problem prior to the Closing Date.

NYC 357317.7 18821 00203

ARTICLE 13.                                          Real Property Tax Matters; Apportionments

13.1.      All real property taxes, general or special (and whether foreseen or unforeseen, ordinary or extraordinary), water and sewer rents (if any), and all other public or governmental charges or assessments levied against each Property (collectively, "Real Property Taxes") shall be adjusted and apportioned between Con Edison and Developer as of midnight the day before the Closing Date and will be assumed and paid thereafter by Developer.

13.2.      If any error has been made with respect to any apportionment, such item shall be corrected as soon as the same is fully ascertained, but no later than 365 days after the Closing.

13.3.      After the date of this Agreement and before the Closing, Con Edison shall make necessary filings to protest or reduce Real Property Taxes as to each Property for the fiscal year starting July 1, 2002 and each subsequent fiscal year of New York City until the Closing of such Property. Con Edison shall have full authority (in its sole discretion) to settle or otherwise compromise any proceeding to protest or reduce Real Property Taxes which is now or subsequently pending, but Con Edison shall not without the prior written consent of Developer (not to be unreasonably withheld), after the giving of any notice scheduling a Closing pursuant to this Agreement, withdraw, terminate, or settle any such proceeding affecting the year in which such Closing will occur unless a Developer Event of Default has occurred. Real Property Tax refunds (if any) received by either party after the Closing, after deduction for Fees-And-Costs of collecting the same, which are: (a) attributable to any fiscal year before the Closing, shall be paid to Con Edison; and (b) attributable to the fiscal or tax year in which the Closing occurs, shall be apportioned between Con Edison and Developer under Section 13.1. A party who receives a refund of Real Property Tax which is subject to this Section shall pay the amount (if any) due to the other party within 10 Business Days after receipt.

13.4.      This Article shall survive the Closing.

13.5.      The customs in respect of title closings of The Real Estate Board of New York, Inc. shall apply to apportionments under this Article unless otherwise specified.

13.6.      In the event that separate permanent tax lot numbers have not been issued for 685 First Avenue or 708 First Avenue/Waterside before the applicable Closing Date, Developer and Con Edison agree that from the Closing Date of each such Property until the date of issuance of a tax bill reflecting the issuance of separate permanent tax lot numbers, Con Edison and the applicable Title LLC shall execute and deliver all required documents and use good faith efforts to obtain an apportionment by the New York City Department of Finance of Real Property Taxes between 708 First Avenue and Waterside, or 685 First Avenue and the adjacent property, as applicable, and shall pay their respective proportionate shares of Real Property Taxes before the same become delinquent; and each party shall indemnify the other for the portion of Real Property Taxes attributable to such party's parcel and for penalties or Fees-And-Costs resulting from a party's failure to pay such share on a timely basis. If Con Edison and the applicable Title LLC are unable to obtain such an apportionment from the Department of Finance, they shall apportion the Real Property Taxes attributable to land based

on the relative fair market values of the parcels. This Section shall not apply after the issuance of permanent tax lot numbers for each such parcel. Con Edison and the applicable Title LLC shall cooperate with each other in instituting any tax certiorari proceedings applicable to periods when both Con Edison and the Title LLC both have interests in the same tax lot. If the parties are unable to agree on the relative fair market values of their parcels, the issue shall be determined under the procedures applicable to a determination of FMV under Article 21, which shall be deemed to apply for this purpose. In such event, "FMV" under Article 21 shall mean fair market value of each party's interest in the respective Property which is the subject of the dispute under this Section.

13.7.      Promptly following the execution and delivery of this Agreement, Con Edison shall commence good faith efforts to obtain tax lot subdivisions of 708 First Avenue and Waterside, and 685 First Avenue and its adjacent property, before the applicable Closing Dates for such Properties (provided, however, that Con Edison shall have no liability for any failure to seek or obtain any such subdivision).

---

ARTICLE 14.                                                     Closing Dates; Closings

---

14.1.      The Closing Dates for the Closings under this Agreement shall be as follows (subject to Sections 6.9, 7.2, and 21.3):

(a)      as to any GMV Closing, 30 days after Con Edison gives a GMV Closing Notice under Section 14.5;

(b)      as to the Developer Call Closings, on the date determined pursuant to Section 14.4;

(c)      as to the Outside Date Closing, on the date specified in Section 14.6;

(d)      as to all other Closings, on the 30th day after the Rezoning Approval Date; but

(e)      in no event shall any Closing occur after the Outside Date.

14.2.      As to each Property, the Closing shall take place at 10:00 a.m. on the applicable Closing Date at the offices of Con Edison's counsel (or at another location in the City designated by Con Edison).

14.3.      If and to the extent that the conditions to Developer's obligations in Section 10.1 are not satisfied as to a particular Property on or before the Outside Date (other than as a result of a Developer Event of Default), then, upon Developer's written demand, the First L/C, the Second L/C, the Third L/C, and the Call Date L/C (each to the extent not previously paid or drawn for any Property as to which Closing of title has occurred) shall be returned to Developer (and the RDE Deposit shall be apportioned as set forth in Section 9.6); and thereafter

neither party shall have any liability to the other party with respect to the particular Property except as specified in Articles 8, 22 and 24.

14.4.    Developer shall have the right ("Developer Call Option") to require Con Edison to convey the Properties to Developer for payment of the Developer Call Price upon the following conditions and otherwise subject to the terms of this Agreement:

(a)    Developer must exercise the Developer Call Option as to all Properties not yet deeded to Developer at a GMV Closing;

(b)    If Developer exercises the Developer Call Option, Developer shall accept each Property "as-is"—i.e., subject to the current physical condition of each Property regardless of and whatever the status of RDE under the RDE Contract and regardless of and whatever the status of the Exit Insurance (whether in effect, in compliance, or in dispute), although this provision shall not be deemed a waiver of any rights of Developer or Con Edison under the RDE Contract or the Exit Insurance;

(c)    All Closings of title under the Developer Call Option shall occur on or before the Developer Call Date, subject to Section 14.4(e);

(d)    Developer shall exercise the Developer Call Option by notice (the "Call Notice") to Con Edison at least 45 days before the Developer Call Date (time being of the essence with respect to the delivery of such notice);

(e)    if, for any reason or no reason (other than a Con Edison or a Developer Event of Default), all Closings of title under the Developer Call Option do not occur on or before the Developer Call Date, Developer shall remain obligated to complete such Closings (subject to Section 14.1(d)); but the Rezoned Price and the As-Built Amount shall be subject to increase pursuant to Section 3.5 unless Developer has delivered the Call Date L/C on or prior to the Developer Call Date with respect to all Properties for which Closings have not occurred on or prior to the Developer Call Date; and

(f)    Except for a Financing Transfer to a Developer Lender (subject to the conditions of Article 26), Developer shall not be permitted to Transfer any Development Rights appurtenant to the Properties (i) until Developer has paid Con Edison the Rezoned Price, or (ii) if the Rezoning Approval Date has not occurred before the Outside Date, until after the Outside Date.

14.5.    Subject to the terms of this Agreement, Con Edison will have the right to require GMV Closings by giving notice to Developer (each such, a "GMV Closing Notice") at any time after the following dates and before the Outside Date: (a) with respect to either or both of 616 First Avenue and 685 First Avenue, one year after the GMV Trigger Date if RDE Completion has occurred; (b) with respect to (i) either or both of 616 First Avenue and 685 First Avenue and (ii) 708 First Avenue and Waterside together, two years after the GMV Trigger Date if RDE Completion has occurred; and (c) with respect to any and all Properties, three years after the GMV Trigger Date if RDE Completion has occurred.

14.6    If the Rezoning Approval Date has not occurred by the Outside Date and Developer has not exercised the Developer Call Option, Developer shall have the option to purchase all Properties not previously deeded to Developer (the "Outside Date Option"), to be exercised by notice given to Con Edison at least 120 days before the Outside Date (the "Outside Date Notice"), time being of the essence with respect to the giving of such Notice.  If Developer exercises the Outside Date Option, the Purchase Price for each Property (the "Outside Date Call Price") shall be an amount equal to: (a) $125 times 12 FAR times the Lot Area for each Property in Section 3.9 (plus 50% of the FMV thereof above $125 per square foot of 12 FAR times such Lot Area as of the Outside Date, as determined pursuant to Article 21); plus (b) the As-Built Amount (plus CPI thereon from Developer Call Date); plus (c) any additional amounts becoming due and payable thereafter under the Future Rezoning Covenant.  The Closing of the Outside Date Option shall occur on a date specified by Developer, but within 30 days after the date of delivery of the Outside Date Notice (the "Outside Date Closing").  If there is a pending Legal Proceeding on the 120th day prior to the Outside Date (which would have the effect of extending the Outside Date if same were pending on the Outside Date), Developer shall be entitled to give the Outside Date Notice within 30 days following a Final Determination of such Legal Proceeding (and if such Final Determination occurs before November 15, 2006 the Outside Date shall be extended as necessary to permit the Outside Date Closing to occur prior to expiration of this Agreement, but not beyond November 15, 2008).  If Developer exercises the Outside Date Option, Developer shall accept each Property "as is"—*i.e.*, in the physical condition described in Section 14.4(b) but otherwise subject to the terms of this Agreement -- although such acceptance shall not be deemed a waiver of any rights of Developer or Con Edison under the RDE Contract or the Exit Insurance.

| ARTICLE 15. | Closing Deliveries; Related Matters |
|---|---|

15.1.    Subject to the terms of this Agreement, Con Edison shall execute and deliver to Developer at each Closing:

(a)    the Deed to the respective Property (and, as to Waterside, the Assignment of Ground Lease);

(b)    as to 685 First Avenue and 708 First Avenue/Waterside, the Zoning Lot Agreement in the applicable form attached hereto as Exhibit "L";

(c)    the other Closing Instruments to be executed and/or delivered by Con Edison pursuant to Schedule "7" or other provisions of this Agreement.

15.2.    Subject to the terms of this Agreement, Developer shall execute and/or deliver to Con Edison at each Closing:

(a)    payment of the Purchase Price then due and payable with respect to the particular Property;

(b)    for any GMV Closing, the Rezoning Collateral;

(c)     the Future Rezoning Covenant for each Property;

(d)     for any Developer Call Closing, the Developer Call L/C;

(e)     if RDE Completion has occurred, Con Edison may retain (and receive payment from the RDE Contractor and/or the Exit Insurer) any portion of the RDE Deposit allocated to such Property but not previously expended; and

(f)     the other Closing Instruments to be executed and/or delivered by Developer pursuant to Schedule "7" or other provisions of this Agreement.

15.3.     At each Closing, Developer and Con Edison shall keep and perform their respective covenants and responsibilities to be performed at the Closing under this Agreement.

ARTICLE 16.                                    Representations and Warranties of Con Edison

16.1.     Con Edison makes the representations and warranties set forth below as of the date of this Agreement and as of each Closing Date:

(a)     Schedule "9", Part Two, which sets forth representations and warranties by Con Edison concerning its organization and ownership, authorization of this Agreement, and other matters, is incorporated herein by reference.

(b)     Except as set forth in Schedule "6", to Con Edison's actual knowledge, there are no pending Legal Proceedings against Con Edison in connection with the Property or Properties to be conveyed at the particular Closing that would prevent or prohibit: (i) Con Edison from obtaining the PSC Approval; (ii) Developer from obtaining the Proposed Rezoning; or (iii) the conveyance of the Property or Properties to a Title LLC.  For purposes of this Section 16.1(b), Con Edison's actual knowledge shall be deemed to include, also, the actual knowledge of Con Edison's General Counsel.

(c)     Con Edison has received no written notice of any Condemnation with respect to any Property to be conveyed at the particular Closing except as set forth in Schedule "6".

(d)     The only approval (other than the approval of Con Edison's Board of Trustees, which has been obtained, and other than any approvals of any Government Entities in connection with the performance of RDE under the RDE Contract) that Con Edison requires in order to convey the Properties is a Final Determination of the PSC approving the sale of the Properties pursuant to the New York Public Service Law (and satisfaction of all conditions imposed by the PSC in connection with such Final Determination).

16.2.     At or prior to each Closing, Con Edison shall terminate Service Contracts (if any) with respect to the particular Property and shall pay all termination costs in connection therewith.

16.3.    Con Edison will have no employees engaged in the operation, management, or repair of a Property who are required to become employees of Developer at or after the Closing of such Property; and Developer has no obligation to employ any employees of Con Edison.

16.4.    At each Closing Con Edison shall furnish a certificate to Developer updating Con Edison's representations and warranties in Section 16.1 to reflect any changes occurring after the date of this Agreement.  Con Edison agrees, however, that no such change within Con Edison's control shall adversely impact Con Edison's ability to perform Con Edison's obligations under this Agreement.

ARTICLE 17.    Representations and Warranties of Developer; Certain Agreements

17.1.    Developer makes the representations and warranties set forth below to Con Edison as of the date of this Agreement and as of each Closing Date:

(a)    Schedule "9", Part One, which sets forth representations and warranties by Developer concerning its organization and ownership, authorization of this Agreement, and other matters is incorporated herein by reference.  Representations and warranties of each Developer Principal in Schedule "9", Part One, shall be deemed representations and warranties of Developer for all purposes of this Agreement.

(b)    To Developer's actual knowledge, there are no outstanding judgments, injunctions, or orders of any Government Entity, and no pending Legal Proceedings or material threats of Legal Proceedings, against Developer, any Developer Principal, any of the Fishers or Solow which would have a material adverse effect on the performance by any of them of the obligations of any of them under this Agreement or the Closing Instruments.

(c)    Schedule "10" hereto lists certain financial statements furnished to Con Edison by Developer and Statements of Condition furnished by the Developer Principals and the individuals who are the ultimate direct or indirect beneficial owners of the Developer Principals Controlled by Solow and the Fishers, including the date as of which each such statement was prepared and the independent certified public accountants who prepared such statement. Developer has delivered true, correct, and complete copies of each of these financial statements and Statements of Condition to Con Edison before the signing of this Agreement.  Developer shall furnish an update of[7] each such financial statement and Statement of Condition, as well as financial statements of the applicable Title LLC, at the Closing of each Property.  Each Statement of Condition listed in Schedule "10" (and each update) is true and correct.  Each financial statement listed on Schedule "10" (and each update) fairly presents the financial

---

[7]    As to a financial statement, "update" shall mean an audited statement as of the end of the most recent fiscal year, except that between January 1st and April 1st of any year, "update" shall mean an unaudited statement for the most recent fiscal year.  In either case, Developer shall also deliver (or cause to be delivered) a letter from the respective chief financial officer (or equivalent functionary) that as of the date of delivery the Person for whom the statement is delivered had no change in financial condition from the date of the last audited statement that would adversely impact Developer's (or the respective Title LLC's) ability to perform Developer's (or the respective Title LLC's) obligations under this Agreement.

condition of the Person whose business and finances are covered by such statement; and as of the date of such statement such Person had no material liabilities, fixed or contingent or otherwise, except as set forth in such statement. Developer agrees that Con Edison may submit any such financial statement and Statement of Condition to the PSC in connection with the process of seeking PSC Approval; and Developer agrees to furnish such additional financial statements and Statements of Condition as the PSC may require in connection with the application for, or issuance of, PSC Approval.

    17.2.    At the Closing of each Property Developer shall furnish a certificate to Con Edison updating Developer's representations and warranties in Section 17.1 and Schedule "9" to reflect any changes occurring after the date of this Agreement. Developer agrees, however, that: (a) no such change within Developer's control shall adversely impact Developer's ability to perform Developer's obligations under this Agreement; and (b) each such change shall be subject to Con Edison's approval as a condition to Closing, subject to the terms of this Agreement.

ARTICLE 18.                                                           Transfer Taxes; Transaction Expenses

    18.1.    Except as specified elsewhere in this Agreement, each party shall pay the Fees-And-Costs of its own attorneys and Consultants in connection with this Agreement and the transactions contemplated hereunder.

    18.2.    Developer shall pay the costs for the issuance of each Title Insurance Policy and any surveys obtained by Developer.

    18.3.    Con Edison shall pay the New York State Real Estate Transfer Tax and New York City Real Property Transfer Tax due with respect to the entire Purchase Price (as, when and if due and payable) in connection with the conveyance of each Property. Developer shall pay recording fees for recording the Deeds.

    18.4.    The parties believe that no sales or use tax will be payable with respect to the conveyance of the Properties because no personal property is intended to be conveyed and no portion of the Purchase Price has been allocated to any personal property.

    18.5.    Developer shall pay all Fees-And-Costs, and other fees, costs, and charges of any kind, associated with (a) each and every L/C and guaranty (and, if applicable, any amendment thereof) issued pursuant to or with respect to this Agreement; and (b) all Rezoning Collateral issued pursuant to or with respect to this Agreement. Also, Developer shall pay (or reimburse Con Edison for) Fees-and-Costs incurred by Con Edison in connection with the preparation of any additional Rezoning Pledge Agreements and related documentation for any and each new equity owner and the preparation and filing of any additional Uniform Commercial Code financing statements in connection therewith (to the extent necessary to grant Con Edison a pledge of the membership interests in each Title LLC and to perfect such pledge).

18.6.        Developer shall pay all mortgage recording taxes and filing and/or recording costs with respect to the Rezoning Mortgage and all UCCs executed in connection with the Rezoning Pledge Agreement or pursuant to Article 26.

18.7.        Developer shall pay all interest due the issuer on the proceeds of any L/C drawn by or for the benefit of Con Edison pursuant or with respect to this Agreement or any Rezoning Collateral or other Closing Instrument.

ARTICLE 19.                        No Casualty Condition; Material Condemnation

19.1.        Because it is expected that all improvements on the Properties will be demolished for development and/or because the parties have assigned no value to any such improvements, Developer will have no right to terminate this Agreement, or any of Developer's obligations under this Agreement, by reason of any damage to, or deterioration or destruction of, any Property or any improvements thereon from any cause whatsoever.

19.2.        If, before the Closing of a Property, a Government Entity issues written notice of a Material Condemnation or a proposed Material Condemnation with respect to such Property, Developer may terminate this Agreement with respect to such Property by giving notice to Con Edison within 60 days after Developer's receipt of such notice (or before the earlier of the effective date of Condemnation or the Closing, if sooner). Upon the giving of such notice, this Agreement shall terminate with respect to the particular Property (but not as to any other Properties); the portion of the RDE Deposit previously paid as to the particular Property shall be returned to Developer (with interest thereon at the CE Interest Rate from the date of the respective draws); the other L/Cs then held by Con Edison shall be proportionately reduced (as if in accordance with, and subject to, Section 4.5); and thereafter neither party shall have further liability under this Agreement with respect to such Property, subject to Articles 8 and 24. This Section 19.2 shall not apply to any Material Condemnation of which a Government Entity issues written notice after the giving of Developer's Call Notice under Section 14.4.

19.3.        All proceeds of insurance payable by reason of any fire or other casualty affecting any Property (other than proceeds relating to fixtures, equipment and personal property) before the Closing as to a Property shall belong (and be payable) exclusively to Con Edison.

19.4.        If after receiving notice of a Material Condemnation, Developer does not elect to terminate this Agreement with respect to the particular Property (or Developer has given a Developer Call Notice), this Agreement shall remain in full force and effect; there shall be no adjustment to the Purchase Price under this Agreement; any Encumbrances resulting from such Condemnation shall be Permitted Encumbrances; and Con Edison shall assign any awards relating to such Condemnation (and will make no claim for the value of its improvements other than awards relating to fixtures, equipment and personal property, to the extent same do not reduce the award otherwise payable with respect to the land) to Developer at the Closing of the particular Property.

19.5    After Con Edison or Developer receives written notice of any Condemnation with respect to a Property, each party's officers, representatives, and counsel shall be invited to attend all meetings (other than informal meetings) between such party and any Government Entity to discuss such Condemnation. Also, each party shall give the other copies of material correspondence or governmental filings received or sent by such party in connection with any such Condemnation. After the effective date of any such Condemnation, if Developer has not elected (or has no right) to terminate this Agreement under Section 19.2, Con Edison shall have the right to contest by Legal Proceedings the amount offered for the respective Property in such Condemnation. If, at any time thereafter, Con Edison elects not to continue any such contest and/or to accept the amount offered in compensation by the respective Government Entity but Developer is not prepared to accept such offer, Con Edison shall permit Developer to seek higher compensation by appropriate Legal Proceedings provided that:

(a)    Developer shall bear all expenses of any such Legal Proceeding and shall reimburse Con Edison for any Fees-And-Costs incurred by Con Edison in connection therewith;

(b)    such Legal Proceeding shall be conducted by counsel reasonably satisfactory to Con Edison;

(c)    if, as, and when there is a Final Determination in such Legal Proceeding, Con Edison shall receive the amount which Con Edison was prepared to accept before the commencement of such Legal Proceeding; and at the Closing for the particular Property Developer shall pay Con Edison any deficiency between that amount and the final amount actually payable by reason of such Condemnation (unless Developer has previously paid Con Edison the Purchase Price for such Property);

(d)    the only issue in such Legal Proceeding shall be the amount of compensation to be paid by the respective Government Entity for the particular Condemnation; and

(e)    unless Developer has previously paid Con Edison the Purchase Price for such Property, all awards or other amounts payable by the respective Government Entity shall be paid first to Con Edison, who shall then pay Developer the amounts (if any) due to Developer under this Article at the Closing for the particular Property if, as, and when such Closing occurs.

19.6    In the event of any Condemnation which is temporary (i.e., effective or intended to be effective for a limited period of time), Con Edison shall receive (and may retain) the entire award with respect thereto unless the period of such Condemnation continues after the Closing of the respective Property. In the latter event, the Condemnation award shall be prorated between Con Edison and Developer in proportion to the relative times of such Condemnation before and after the Closing for such Property, which shall be estimated by the parties if such periods are not definitely ascertainable on the Closing Date. As to any such estimate, upon the conclusion of the particular Condemnation, if the estimated apportionment at Closing resulted in any overpayment to either party, the overpaid party shall repay the overpayment to the other party within 30 days after the conclusion of such Condemnation, with interest on the overpayment at the Money Market Rate from the date of the overpayment.

19.7.    This Article constitutes an express waiver by the parties of any law apportioning risk of casualty or other loss and/or condemnation under contracts for the sale or purchase of real property (including §5-1311 of the New York State General Obligations Law).

ARTICLE 20.                                                          Certain Regulatory Matters

20.1    If the PSC imposes any Transaction Conditions on Con Edison in connection with the granting of the PSC Approval, and if Con Edison does not choose (in its discretion) to accept any such Transaction Conditions, Con Edison shall have the right (at Con Edison's expense) to contest any or all such Transaction Conditions by Legal Proceedings. However, if Con Edison makes such election, Con Edison shall prosecute the particular Legal Proceedings to Final Determination unless (a) Con Edison decides at any time (in its discretion) to accept the contested Transaction Conditions (including by settlement with the PSC)) or (b) Developer elects to pay and be responsible for all such Transaction Conditions as set forth below.

20.2    If, as, and when any Legal Proceeding under Section 20.1 results in a Final Determination that imposes any Transaction Conditions on Con Edison, Con Edison may terminate this Agreement by notice to Developer given within 30 days after such Final Determination unless, within 21 days after the giving of Con Edison's notice, Developer (in its discretion) gives notice to Con Edison electing to keep this Agreement in effect and to pay and be responsible for all such Transaction Conditions, subject to Sections 20.3 and 20.4.    If Developer does not give such notice, this Agreement shall terminate on the 31st day after the giving of Con Edison's termination notice; and thereafter neither party shall have any further liability to the other (subject to Articles 8 and 24) except that Con Edison shall pay Developer's Fees-And-Costs incurred to negotiate, and perform Developer's obligations under, and to accomplish the purposes of, this Agreement and the RDE Contract (including attorney's fees, amounts paid to SEQRA Consultant, costs incurred in the master planning design competition, and architectural fees) but not to exceed ten million dollars ($10,000,000) in the aggregate for all such Fees-And-Costs.    (Any payment under this Section shall preclude any payment under Section 22.8.)

20.3    Subject to Section 20.4, at any time after Con Edison commences a Legal Proceeding to contest Transaction Conditions under this Article 20 and before 21 days after the giving of a termination notice by Con Edison under Section 20.2, Developer may elect, by notice to Con Edison, at Developer's expense, to pay and/or satisfy all such Transaction Conditions which Con Edison is then contesting.    In such event Con Edison shall end the applicable Legal Proceedings; and Developer's payment and/or satisfaction of all Transaction Conditions shall be a condition to the Closing of all Properties (or to those Properties as to which the particular Transaction Conditions exclusively apply).

20.4    Notwithstanding anything to the contrary in this Article 20, Developer shall not have the right to continue this Agreement, and Con Edison's notice of termination under Section 20.2 shall be final, as to any Transaction Condition which cannot be satisfied by the payment of money only unless (a) the same pertains only to the Property or Properties which Developer will acquire under this Agreement and (b) either Con Edison will have no liability

with respect to all Transaction Conditions after the Closing of the Property or Properties to which the same apply or, as a condition to the respective Closing, Developer executes and delivers an agreement (with security reasonably satisfactory to Con Edison) that Developer will assume and be entirely responsible for discharging and satisfying such Transaction Conditions from and after the Closing and will indemnify Con Edison against all Loss-And -Expense which Con Edison may incur, or which may be asserted against Con Edison, by reason of Developer's failure to do so.

20.5    If Con Edison contests any Transaction Conditions by Legal Proceedings pursuant to this Article, the Outside Date shall be extended day-for-day for each day after the date such Legal Proceeding commences until the date on which a Final Determination issues in such Legal Proceeding but in no event after November 15, 2008.

20.6    In this Article 20, "Transaction Conditions" means the imposition by the PSC, as a condition to the granting of PSC Approval, of any costs, liabilities, other requirements and/or obligations on Con Edison:

(a)    which are not set forth in this Agreement as originally signed by Con Edison and Developer; and/or

(b)    which are otherwise in addition, or supplemental, to the costs, liabilities, requirements, and/or obligations assumed by Con Edison pursuant to this Agreement.

20.7    Notwithstanding anything to the contrary in Section 20.6, Transaction Conditions shall in no event include any of the following:

(a)    standard or "boilerplate" non-financial procedural conditions which are typical for PSC approval of utility property dispositions and are not materially adverse to Con Edison;

(b)    any condition which the PSC has advised Con Edison in writing on or before the date of this Agreement - by letter or other official PSC document delivered to Con Edison - that the PSC intends to impose in connection with the PSC Approval;

(c)    the requirement that Con Edison create replacement generating capacity at another facility as a condition precedent to the decommissioning of Waterside; or

(d)    any requirement relating to the allocation of Net Purchase Proceeds between Con Edison's shareholders and ratepayers; provided, however that any condition or requirement shall be a Transaction Condition which imposes any costs, charges or obligations on Con Edison's shareholders and shall be treated the same as any other Transaction Condition for purposes of Section 20.2.

For purposes of this Agreement:

"Con Edison Transaction Expenses" means all expenses incurred by Con Edison to negotiate, and perform Con Edison's obligations under, and to accomplish the purposes of, this Agreement and the RDE Contract, including the premiums for the Exit Insurance and the

amounts under the RDE Contract paid by Con Edison, Con Edison's attorneys' fees and amounts paid by Con Edison to the SEQRA Consultant.

"Net Purchase Proceeds" means the Purchase Price less the Con Edison Transaction Expenses.

ARTICLE 21.                                                          FMV Appraisals
_____

21.1.      This Article 21 provides the mechanism for determining Fair Market Value increases pursuant to Section 3.5.  For purposes of this Agreement:

"Fair Market Value" or "FMV" means the fair market value of a Property before Rezoning (for purposes of determining the FMV of the GMV) or the fair market value of Floor Area (for purposes of determining the FMV of FAR), as applicable, as of the applicable Closing Date, taking into account those facts and circumstances which are then reasonably and customarily taken into account by professional appraisers.

"Independent FMV Appraiser" means an individual, jointly selected by Developer and Con Edison (or the appraisers appointed by them), who has no less than fifteen years of commercial appraisal experience in midtown Manhattan and who has not been engaged (and whose firm has not been engaged) by Developer, any Developer Principal, Solow, any of the Fishers, Morgan Stanley or Con Edison within the past ten years.

21.2.      When Fair Market Value must be determined in connection with adjustments to the Purchase Price pursuant to Section 3.5, if the parties have not agreed on FMV as of the particular Closing Date or other date when the respective payment of the Purchase Price is due, an appraiser for each party shall submit an appraisal in MAI form to the other party for the value of (i) the Floor Area (in the case of an FMV increase to the Rezoned Price) or (ii) the Properties prior to Rezoning (in the case of an FMV adjustment to the GMV), as applicable, within 30 days after either party notifies the other party that an FMV determination is required. If either party fails to submit an appraisal in FDIC form by such 30th day, then the appraisal submitted by the other party shall be binding on the parties.  If the appraisers cannot agree upon the applicable Fair Market Value within 10 days after the appraisals are exchanged, and if the parties have not previously designated such individual, the appraisers shall jointly designate an Independent FMV Appraiser within five days after the end of such 10-day period.  If the two appraisers cannot agree upon an Independent FMV Appraiser within such five day period, then the Independent FMV Appraiser shall be appointed by the AAA upon request of either party. The AAA shall appoint the Independent FMV Appraiser within 10 days after the date of such request.   Within 30 days after such appointment, the Independent FMV Appraiser shall determine the applicable Fair Market Value by selecting the FMV specified in the appraisal previously submitted (as set forth above) by one or the other of the parties.   Any such determination of the Independent FMV Appraiser shall be conclusive and binding on the parties as the decision of an arbitrator under the CPLR.  Each party shall pay fifty percent (50%) of the fees and charges of the Independent FMV Appraiser.  For purposes of this Article, an appraisal in MAI form means an appraisal conforming to generally accepted

appraisal standards of the Appraisal Standards Board which uses three market value approaches — cost, income, and comparable sales — and reconciles the results of each to estimated market value.

    21.3    If necessary, the respective Closing or other due date for the particular Rezoned Price or GMV shall be postponed to allow the time periods specified in Section 21.2; provided, however, that if the parties have not agreed on the respective FMV, and/or the Independent FMV Appraiser has not determined the applicable FMV within 70 days after the originally-scheduled Closing Date or other date when the respective payment of the Purchase Price was due, within 15 days thereafter, time being of the essence, Developer shall pay to Con Edison the amount of the applicable Purchase Price including the amount of FMV in dispute; and, if applicable, the Closing shall occur. If, based on a subsequent determination of the Independent FMV Arbitrator, Developer has made an overpayment on account of the respective FMV, Con Edison shall refund such overpayment to Developer within 15 days thereafter, with interest at the Developer Interest Rate.

| ARTICLE 22. | Events of Default; Remedies |
| --- | --- |

    22.1.    In this Agreement, "Developer Event of Default" means any of the following occurring on or before the Closing Date as to any Property:

    (a)    Developer defaults (i) in delivering the Second L/C, the Third L/C, the Rezoning Collateral, or the Developer Call L/C, when due under this Agreement; (ii) in paying the GMV, the Developer Call Price, the Rezoned Price, and/or the As-Built Amount when due and payable for any one or more Properties under this Agreement; and/or (iii) in Closing title to any one or more of the Properties;

    (b)    any representation or warranty of Developer is not true, complete, and correct in all material respects as of the date when made or required to be made under this Agreement; and/or

    (c)    Developer defaults materially in performing any of Developer's other obligations to be performed under this Agreement at or before any Closing; and, as to each of (b) and (c) Developer fails to cure or correct the applicable matter within 30 Business Days after notice from Con Edison.

    22.2.    (a)    Subject to Section 22.2(b) below, upon the occurrence of a Developer Event of Default, Con Edison may terminate this Agreement by notice to Developer, in which event Con Edison shall be entitled as its sole and exclusive remedy (subject to its remedies under Sections 22.2(b) and 22.6) to draw and retain the full amounts of the First L/C, the Second L/C (if previously delivered), the Third L/C (if previously delivered), and to retain (or cause the RDE Contractor and/or the Exit Insurer to retain) the RDE Deposit, all the foregoing as liquidated damages. Developer and Con Edison agree that the remedy set forth in this Section is reasonable and appropriate because of the unique nature and the magnitude of the Properties, as well as their environmental history and condition and also the complexity of the Rezoning

contemplated under this Agreement. Both parties agree that Con Edison's actual damages for Developer's breach would be exceptionally difficult (if not impossible) to compute and that Con Edison's remedy of liquidated damages is entirely reasonable and appropriate in the circumstances. For this reason, also, Developer agrees that Con Edison would have no adequate remedy at law and waives any claim relating to the reasonableness of such liquidated damages. A termination of the Agreement pursuant to this Section shall not apply to any Property as to which a Closing has previously occurred; except, however, at Con Edison's election, such termination shall constitute an event of default under the Rezoning Collateral, or an event which gives Con Edison the right to draw under the Developer Call L/C (if any), then held by Con Edison with respect to such a Property.

(b)    If, after the Call Date L/C has been delivered, Developer fails to pay the Developer Call Price (and all interest due thereon, if any) for any Property when due and payable under Section 3.4, Con Edison shall have the right to compel specific performance of Developer's obligation to close on such Property by drawing on the Call Date L/C in the full amount of the Developer Call Price for such Property together with accrued interest from the Developer Call Date at the Money Market Rate and delivering the deed and the other Closing Instruments with respect to such Property to Developer; and payment of the full Developer Call Price (and all accrued interest thereon) to Con Edison pursuant to this Section 22.2(b) shall be Con Edison's sole remedy for a default by Developer in paying the Developer Call Price with respect to the particular Property.

22.3.    In this Agreement, "Con Edison Event of Default" means any of the following occurring on or before the Closing Date: (a) Con Edison defaults in conveying title to any of the Properties as and when required under this Agreement; (b) any representation or warranty of Con Edison is not true, correct, and complete in all material respects as of the date when made or required to be made under this Agreement; and/or (c) Con Edison defaults materially in performing any of Con Edison's other obligations to be performed under this Agreement at or before the Closing; and, as to each of (b) or (c), Con Edison fails to cure or correct the applicable matter within 30 Business Days after notice from Developer.

22.4.    Upon the occurrence of a Con Edison Event of Default, Developer may elect either of the following as Developer's exclusive remedy:

(a)    Developer may terminate this Agreement as to any one or more Properties by notice to Con Edison, in which event Developer shall receive from Con Edison, within 30 days after the date of delivery of such termination notice, return of the First L/C, the Second L/C, the Third L/C, repayment of the RDE Deposit (to the extent not applied to the Purchase Price for a previous Closing, with interest at the Developer Interest Rate from the date hereof), or as to such L/Cs a reduction in the amount thereof in accordance with Section 4.5, and as to the RDE Deposit an allocable reduction thereof, in the event the termination relates to less than all of the Properties; or, alternatively,

(b)    Developer shall have the right to compel specific performance of Con Edison's obligation to sell all the Properties to Developer (but without abatement, credit, or reduction in the Purchase Price) in accordance with this Agreement. Con Edison agrees that the

remedy of specific performance is reasonable and appropriate under this Section because Developer would have no adequate remedy at law for Con Edison's failure to convey.

Any termination of this Agreement pursuant to (a) above shall not apply to any Property as to which a Closing has previously occurred. Developer shall not be entitled to monetary damages against Con Edison under either (a) or (b) above for any reason.

22.5. For the avoidance of doubt, the remedies of the parties set forth in this Article shall not apply to any Property as to which a Closing has occurred, and title has been conveyed, before the applicable Event of Default (although such Event of Default may result in other remedies under the Rezoning Collateral for such Property).

22.6. The remedies of each party under this Article 22 shall include, also, any Fees-And-Costs to which such party may be entitled under Section 27.14.

22.7. As to all remedies of the parties under this Article, each party agrees that there has been a course of negotiation and conduct between the parties giving specific consideration to the foregoing remedies and that such party has been represented by counsel and is experienced in complex real estate transactions.

22.8 Although the failure to obtain PSC Approval shall not be a Con Edison Event of Default, if: (a) the PSC issues a Final Determination not to issue the PSC Approval on or before the Outside Date with respect to two or more Properties; or (b) the PSC fails to issue the PSC Approval with respect to two or more Properties by the Outside Date; or (c) if Con Edison's representation in Section 16.1(d) is incorrect and Con Edison fails to cure such incorrect representation within the period set forth in Section 22.3; or (d) Con Edison is unable or unwilling to Remove judgments (following all applicable notice and cure periods) and either (i) Con Edison is required to Remove such judgments pursuant to Section 7.3(b) but fails to do so or (ii) Con Edison is not required to Remove such judgments pursuant to Section 7.3(b), fails to do so and Developer has agreed to terminate the Agreement with respect to the applicable Property or Properties; then Developer shall be entitled to reimbursement from Con Edison of Developer's Fees-and-Costs incurred to negotiate, and perform Developer's obligations under, and to accomplish the purposes of, this Agreement and the RDE Contract (including attorneys' fees, amounts paid to SEQRA Consultant, costs incurred in the master planning design competition, and architectural fees), but in no event shall the amount payable by Con Edison under this Section exceed in the aggregate ten million dollars ($10,000,000). Subject to the foregoing, in the event that the PSC issues a Final Determination not to issue the PSC Approval on or before the Outside Date as to any Property, this Agreement shall terminated as to the respective Property effective upon the date of such Final Determination (and such termination shall have the same effect as a termination of this Agreement on the occurrence of the Outside Date).

22.9 For the avoidance of doubt, the terms "Con Edison Event of Default" and "Developer Event of Default" shall not be deemed to include the applicable party's failure to satisfy a Closing condition which is not also a covenant or agreement.

22.10 If Con Edison is unable or unwilling to Remove judgments that Con Edison is not required to Remove pursuant to Section 7.3(b) and Developer has not consented to

a termination of the Agreement with respect to the applicable Property pursuant to Section 7.2, at any time after Developer refuses to consent to termination but prior to November 15, 2006, Developer can elect to terminate the Agreement as to such Property upon 60 days prior notice to Con Edison, and unless Con Edison Removes such judgments and notifies Developer of same within such 60 day period, this Agreement shall terminate with respect to such Property at the end of such 60 day period (and any L/C that Con Edison then holds with respect to such Property shall be reduced in accordance with Section 4.5 or returned to Developer in accordance with Section 4.7, as applicable). If Con Edison removes such judgments and notifies Developer of same within such 60 day period, then this Agreement shall not terminate as to such Property and Con Edison shall convey, and Developer shall be required to purchase, such Property subject to the terms of this Agreement.

**ARTICLE 23.**                          Post-Closing Remedies

        23.1.     The provisions of this Agreement shall survive, with respect to each Property, the delivery of the deed to such Property, except for Sections 7.2, 7.3, 7.4, 7.6, 7.8, and 7.9 (which shall be deemed to terminate with respect to each Property upon conveyance of the deed) and as otherwise specifically provided in this Agreement.

        23.2.     After the Closing of a particular Property, Con Edison shall have a claim for damages if any representation or warranty of Developer in this Agreement or any Closing Instrument (other than a matter of which Developer gave notice under Section 12.4) is materially untrue, incorrect, or incomplete when made or required to be made under this Agreement and if Con Edison gives notice of such matter to Developer within 365 days after the Closing for the particular Property, except for matters covered by Sections 17.1(a), 24.1 and Part One of Schedule "9", for which any claim shall be subject to the applicable statute of limitations.

        23.3.     After the Closing of a particular Property, Developer shall have a claim for damages if any representation or warranty of Con Edison in this Agreement or any Closing Instrument (other than a matter of which Con Edison gave notice under Section 12.5) is materially untrue, incorrect, or incomplete when made or as of the date when required to be made under this Agreement and if Developer gives notice of such matter to Con Edison within 365 days after the Closing for the particular Property, except as to matters covered by Sections 16.1(a), 24.1 and Part Two of Schedule "9", for which any claim shall be subject to the applicable statute of limitations.

**ARTICLE 24.**                          Real Estate Brokers

        24.1.     Con Edison represents and warrants to Developer, and Developer represents and warrants to Con Edison, that each knows of no real estate broker or finder, other than the Designated Consultants, who has claimed or has the right to claim any fee, commission or other compensation in connection with the transactions contemplated by this Agreement, and that each has taken no actions which would form the basis for such a claim.

NYC 357317.7 18821 00203

24.2.    Con Edison shall pay any commission due the Designated Consultants pursuant to a separate agreement between Con Edison and the Designated Consultants.

24.3.    Con Edison shall indemnify, hold harmless and defend Developer, the Developer Principals, and their respective members, managers, and employees, against all liability, loss, cost, claim or expense (including Fees-And-Costs) arising out of any breach of Con Edison's representation in Section 24.1.  Developer shall indemnify, hold harmless, and defend Con Edison, any entity Controlled by, Controlling or under common Control with Con Edison, and their respective directors, officers, and employees against all liability, loss, cost, claim or expense (including Fees-And-Costs) arising out of any breach of Developer's representation in Section 24.1.

24.4.    This Article shall survive the Closing (or, if the Closing does not occur, the termination of this Agreement).

ARTICLE 25.                                                                                      Notices

25.1.    All notices, consents or other communications under this Agreement must be in writing and addressed to each party at its respective Notice Address set forth on Schedule "8" hereto (or at any other address which either party may designate by notice to either other party from time to time), except as set forth in Section 5.7.  Any notice required by this Agreement to be given or made within a specified period of time, or on or before a date certain, shall be deemed given or made if sent by hand or by U.S. Express, registered or certified mail (return receipt requested and postage and registry fees prepaid).  Delivery "by hand" shall include delivery by commercial express or courier service.  A notice sent by U.S. Express, registered or certified mail shall be deemed given on the date of receipt (or attempted delivery if refused) indicated on the return receipt.  All other notices shall be deemed given when actually received. A notice may be given by a party or by its legal counsel.

ARTICLE 26.                                                                    Limitations on Assignment

26.1.    Subject to the terms of this Article 26 and Section 6.14, Developer shall not Transfer this Agreement, or any part of Developer's direct or indirect right, title, and/or interest in this Agreement, without Con Edison's prior written consent; provided, however, that Transfers of Ownership Interests in Developer, Developer Principals and Title LLCs shall be permitted, subject to the terms of this Article.

26.2.    Developer has represented to Con Edison that Developer desires to acquire the Properties for development—and not for resale at any time before the Article 26 Date. Accordingly, Developer hereby agrees, as part of the consideration to Con Edison under this Agreement, that Developer shall pay (or cause to be paid) to Con Edison fifty percent (50%) of all Net Sale Proceeds (defined below) received by Developer, any Developer Principal, or any Title LLC (or by any Person Transferring an Ownership Interest in Developer, any Developer

Principal, or any Title LLC) from every Covered Sale (defined below) occurring at any time before the Article 26 Date. For the avoidance of doubt, this Article 26 shall not prohibit Covered Sales, subject to compliance with the requirements of this Article.

    26.3.      In this Agreement:

      (a)     "Article 26 Date" means with respect to each Property, four years after the earlier of (i) the Closing of title to such Property other than a GMV Closing; or (ii) the Developer Call Date if Developer delivers the Call Date L/C for all Properties but does not close title to the applicable Property before that date; but in either case this date in (i) or (ii) shall be not later than the date when construction of all Developments on such Property is more than 50% complete. With respect to each Title LLC and Transfers of any Ownership Interests therein, the Article 26 Date shall be the Article 26 Date for the Property owned by such Title LLC.

      (b)     "Covered Sale" means:

        (i)     any Transfer of any Property or any interest therein other than sales in the ordinary course of condominium units or lots in a Development; or leases to tenants for occupancy of space in such Development; or Financing Transfers; or easements, covenants, or other land-use restrictions granted in connection with a Development (without receipt of third-party payments for the same); and

        (ii)     any Transfer of an Ownership Interest (defined below) in Developer, any Developer Principal, or any Title LLC other than an Estate Transfer or Financing Transfer.

      (c)     "Estate Transfer" means any Transfer of any Ownership Interest in Developer, a Developer Principal, a New Investor and/or any Title LLC to or among: (i) the spouse, children, siblings, or parents of any of the Fishers or Solow or such New Investor; (ii) a trust for the exclusive benefit of any of the Fishers or Solow or such New Investor and/or his or her spouse, children, siblings and/or parents; or (iii) any entity owned 100% by any of the Fishers or Solow or such New Investor and/or the spouse, children, siblings, or parents of any of them; (iv) another Developer Principal; or (v) a testamentary disposition to an organization exempt under Section 501(c)(3) of the Code; provided that, as a result of any such Estate Transfer, any one or more of the Fishers or Solow, as applicable, retains Control of (as applicable) Developer and/or the Title LLC.

      (d)     "Financing Purpose" means financing of the acquisition of a Property pursuant to this Agreement, financing of Developer's or a Title LLC's costs to perform its obligations under this Agreement, and/or financing of costs of developing a Development on the Properties.

      (e)     "Financing Transfer" means (i) as to any Property, a Transfer to a Developer Lender for a Financing Purpose and (ii) as to any Ownership Interest in Developer, a Developer Principal and/or any Title LLC (1) a Transfer to a Developer Lender as security for a Financing Purpose, or (2) a Transfer to a Person (a "New Investor") who contributes (or agrees to contribute) funds to any of those entities to be used for a Financing Purpose; provided that:

(A) all funds advanced by such Developer Lender or New Investor (other than Fees and Costs of the contribution or financing transaction) are paid into or for the benefit of Developer, the Developer Principal, and/or the Title LLC, as applicable, to be applied for a Financing Purpose and no such funds are paid or distributed to any member of Developer, such Developer Principal, and/or such Title LLC (or the holder of any Ownership Interest in any of them) other than as a Replacement Funding (as defined below); and

(B) any of the Fishers and/or Solow retains Control of Developer and each Title LLC and no New Investor or Developer Lender (except in the enforcement of customary remedies for default) has the power, directly or indirectly to direct the management and policies of Developer or any Title LLC, whether through voting control, contractual rights, or otherwise.

A "Financing Transfer" includes, also, any Transfer among the Fishers, Solow, Morgan Stanley and/or the then-existing holders of any Ownership Interests in Developer, a Developer Principal, or any Title LLC, provided that all the conditions of (A) and (B) above are satisfied.

(f)    "Fishers" means any one or more of Richard L. Fisher, M. Anthony Fisher, Arnold Fisher, Steven Fisher, and Kenneth Fisher.

(g)    "Replacement Funding" means the repayment of an amount lent or invested (which may include interest or a return thereon) by a member or manager of Developer, a Developer Principal, or any Title LLC, provided that an amount equal to or greater than such amount (and the interest or return thereon) is simultaneously reinvested in Developer, the Developer Principal or the Title LLC, as applicable.

(h)    "Solow" means Sheldon H. Solow.

(i)    "Net Sale Proceeds" means all consideration of every kind received by the applicable transferor from or by reason of a Covered Sale (whether cash, notes, shares in a real estate investment trust, or other real or personal property of any kind), as and when received by the applicable transferor (as, for example, cash at a closing; periodic payments of principal and interest under an installment agreement; etc.) minus:

(i)    in the case of a Property:    (A) the Purchase Price paid by Developer to Con Edison for the particular Property; (B) arm's length negotiated real estate brokerage commissions paid to licensed real estate brokers which are not entities Controlled by, Controlling or under common Control with Developer, transfer taxes,[8] and reasonable attorneys' fees incurred by Developer in connection with the applicable Covered Sale; and (C) a return of the applicable transferor's investment in the particular Property (including repayment of borrowings and investment costs); and (D) a return on such investment computed at the CE Interest Rate;

(ii)    in the case of an Ownership Interest:    (A) the amount of the applicable transferor's investment in Developer, the Developer Principal, or a Title LLC, as applicable, and (B) arm's length negotiated real estate brokerage commissions paid to licensed

---

[8]    For the avoidance of doubt, Con Edison shall not be responsible for any transfer taxes payable by the transferor of the particular property or ownership interest but shall remain responsible for transfer taxes due under Section 18.3.

real estate brokers which are not entities Controlled by, Controlling or under common Control with Developer, transfer taxes; and reasonable attorneys' fees incurred by the transferor for the respective transaction; and (C) a return of the applicable transferor's investment in the Ownership Interest (including repayment of borrowings and investment costs); and (D) a return on such investment computed at the CE Interest Rate;

(j)    "Ownership Interest" means a direct or indirect interest in the equity or other ownership interests of a corporation, partnership, limited liability company, trust, or other legal entity;

(k)    "Morgan Stanley" means Morgan Stanley Dean Witter & Co. and any Person controlled by the same; and

(l)    "Getty" means Gordon P. Getty and/or trusts for the benefit of him and/or his natural or adopted children and/or entities controlled by him or such trusts.

26.4    In the event of a Financing Transfer prior to the Closing of the respective Property, each New Investor in the respective Title LLC (other than Morgan Stanley or Getty) shall be subject to Con Edison's prior written consent, not to be unreasonably withheld.

26.5.    Developer shall give notice to Con Edison before the closing or other completion of any Covered Sale and shall direct the payor of the Net Sale Proceeds to make payment (or to execute and deliver any notes or other non-cash consideration) of Con Edison's share thereof directly to Con Edison at the applicable Closing or other completion of the Covered Sale transaction. If Net Sale Proceeds from a Covered Sale of any Property consist partly of cash and partly of non-cash consideration, Con Edison shall have an undivided share of the cash and non-cash consideration, such share being proportional to the amount due Con Edison under this Article. Developer shall promptly notify Con Edison of the occurrence of all Estate Transfers and Financing Transfers.

26.6.    To confirm Developer's obligations under this Article, Developer shall execute and deliver to Con Edison, at the Closing of each Property: (a) a Memorandum of Sale Contract Provision, in the form attached hereto as Exhibit "G", which Con Edison may record against the respective Property after such Closing; and (b) Uniform Commercial Code financing statements against Developer, the Developer Principals, and each Title LLC. Upon the expiration of Developer's obligations under this Article as to a particular Property, Con Edison shall execute and deliver an instrument in form for recording terminating the foregoing as to such Property.

26.7.    If a Person has an Ownership Interest, directly or indirectly, in more than one Title LLC and the Article 26 Date has occurred only as to one of such Title LLCs, the Net Sales Proceeds from a Transfer of such Ownership Interest shall be allocated to each such Title LLC as follows:

(a)    before the Rezoning of all Properties, in the proportion that the Lot Area of the Property as to which the Article 26 Date has occurred bears to the total Lot Areas of all Properties owned by all such Title LLCs; and

(b)    after the Rezoning of all Properties, in the proportion that the Floor Area of the Property as to which the Article 26 Date has occurred bears to the total Floor Area of all Properties owned by all such Title LLCs.

ARTICLE 27.                                                                                    Miscellaneous

27.1.    Each of the parties shall take such additional actions and sign and deliver such other instruments and documents as may be reasonable, necessary or appropriate to effectuate the transactions contemplated under this Agreement; provided, however, that the taking of such acts or the execution of such documents will not result in material cost or liability to the respective party which is not otherwise required under this Agreement.

27.2.    This Agreement shall be governed and construed in accordance with the laws of the State of New York (without regard to principles of conflicts of law).

27.3.    This Agreement shall not be modified, waived, or amended except by written agreement executed by all the parties.

27.4.    This Agreement, together with the Schedules and Exhibits hereto, the First Amendment, and any other document, agreement or instrument which is specifically stated by both parties in writing to form a part of this Agreement or to relate thereto, constitute(s) the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings of the parties relating thereto.

27.5.    Except as expressly provided in this Agreement, no delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof or as a waiver of any other right, power or privilege hereunder; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise hereunder. Except as otherwise provided in this Agreement, the rights and remedies of each party under this Agreement are cumulative and are not exclusive of any rights or remedies which the party may otherwise have at law or in equity.

27.6.    This Agreement may be executed (a) in counterparts, a complete set of which together shall constitute an original and (b) in duplicates, each of which shall constitute an original. Copies of this Agreement showing the signatures of the respective parties, whether produced by photographic, digital, computer, or other reproduction, may be used for all purposes as originals.

27.7.    This Agreement (and all terms thereof, whether so expressed or not), shall be binding upon the respective permitted successors, assigns and legal representatives of the parties and shall inure to the benefit of and be enforceable by the parties and their respective permitted successors, assigns and legal representatives.

27.8.    The Exhibits and Schedules attached hereto or subsequently incorporated herein are (and shall be deemed) parts of this Agreement. The headings of this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

27.9.    The signature of any one of a party's Authorized Representatives, acting alone, shall constitute the duly authorized, valid and binding act of the party for whom the respective person is the Authorized Representative. A party may change (or add) Authorized Representative(s) at any time by notice to the other party; provided that each party shall be entitled to rely upon the written certificate or consent of any person designated by the other party as an Authorized Representative unless and until such relying party receives a notice to the contrary from another Authorized Representative of the party for whom such person is an Authorized Representative.

27.10.    Each party irrevocably submits to the jurisdiction of the courts of (and service of process in) the State of New York and agrees that any action or proceeding arising out of or relating to this Agreement may be brought and/or defended in the Supreme Court of the State of New York, New York County.

27.11.    If any term, covenant, condition or provision of this Agreement is determined by Final Determination to be invalid or unenforceable, the remaining terms, covenants, conditions and provisions of this Agreement shall not be affected thereby but shall be valid and enforceable to the fullest extent permitted by law.

27.12.    Nothing in this Agreement, express or implied, is intended:  (a) to confer on any Person—(other than the parties hereto)—any rights, obligations, liabilities, or remedies; (b) to constitute Con Edison as a partner or co-venturer of Developer, or vice versa; or (c) to waive any claim or right of any party against any Person who is not a party to this Agreement.

27.13.    This Agreement shall be construed without regard to any presumption requiring construction against the party drafting this Agreement.

27.14.    In event of any Legal Proceeding between or among Developer and Con Edison concerning this Agreement, the prevailing party shall be entitled to reimbursement from the losing party for the Fees-And-Costs of such proceeding incurred by the prevailing party.  For this purpose, "prevailing party" means the party who obtains a Final Determination adverse to the other party in or by reason of such Legal Proceeding.

27.15.    The parties agree that they shall not record this Agreement or any memorandum of this Agreement.

27.16.    Unless this Agreement specifies, in a particular context, that a party's consent or approval shall not be unreasonably withheld, such party may withhold its consent or approval in its sole discretion (i.e., for any reason or no reason).

27.17.    (a) In connection with the negotiation and execution of this Agreement and after the signing of this Agreement, Developer has received, and/or will receive, from Con Edison or others various documents and other written and graphic materials pertaining to this Agreement and the transactions contemplated under this Agreement ("Transaction Materials"). Developer agrees to keep strictly confidential all Transaction Materials (other than information which is a matter of public record or is found in other sources readily available to the public, other than as a result of disclosure by Developer or any Related Party) and also this Agreement (and terms and conditions thereof); provided, however, that Transaction Materials and this

Agreement (and the terms and conditions thereof) may be disclosed to Developer Principals, Developer Lenders, potential New Investors, and Developer's and their respective directors, officers, limited liability company managers, employees, counsel, accountants and Consultants, who, in Developer's judgment, need to have access to the Transaction Materials in connection with completion of the transactions contemplated in this Agreement ("Related Parties"). These Related Parties shall be advised of this Section of the Agreement and shall be informed by Developer of the confidential nature of this Agreement and the Transaction Materials and that they are subject to Developer's obligations under this Section; and they shall be directed by Developer to keep all such information in the strictest confidence and use such information only for purposes related to the completion of the transactions under this Agreement. Developer agrees not to make this Agreement or any of the Transaction Materials available, or disclose any of the contents of this Agreement or the Transaction Materials, or disclose or discuss any of the terms, covenants, conditions, or other facts with respect to this Agreement or the Transaction Materials to any Person, other than as permitted by the preceding sentence unless: (a) such Person has been identified in writing to Con Edison; (b) Con Edison has approved in writing the disclosure of this Agreement and the Transaction Materials to such Person; and (c) such Person has entered into a written confidentiality agreement with Con Edison substantially upon the same terms as set forth in this Section. If for any reason whatsoever this Agreement terminates before the Closing of all Properties, Developer agrees (and agrees to cause each Related Party) promptly to return all Transaction Materials to Con Edison or to destroy the same. Developer shall be responsible for a breach by any Related Party of the requirements of this Section. This Section supplements the prior letter agreement concerning confidentiality between Cushman & Wakefield, Inc., as agent for Con Edison, and Developer, which shall remain in effect (notwithstanding Section 27.4) for the period before the signing of this Agreement. (Also, this Section is not intended to limit or contravene Section 8.1).[9]

(b)   Con Edison shall limit the access to the financial statements and Statements of Financial Condition furnished to Con Edison pursuant to Section 17.1(c) and any other financial information submitted to Con Edison pursuant to Article 26 or otherwise by Developer in connection with this Agreement to Con Edison's officers and its financial personnel.

(c)   The obligations of Developer, the Related Parties, and Con Edison under this Article are subject to, and shall be excused to the extent strictly necessary, to comply with court orders, orders of other Government Entities, and other binding legal process.

---

[9]   Parties to discuss confidentiality provisions applicable to lenders, New Investors etc., as well as protocols for press releases, public meetings, etc.

NYC 357317.7 18821 00203

IN WITNESS WHEREOF, DEVELOPER AND CON EDISON HAVE
EXECUTED THIS AGREEMENT AS OF THE DATE FIRST ABOVE WRITTEN:

FSM EAST RIVER ASSOCIATES LLC

By:     Fisher East River Associates LLC

By:     _____
        Name: RICHARD L. FISHER
        Title: MANAGING MEMBER

By:     East River Realty Development LLC

By:     _____
        Name: Sheldon H. Solow
        Title:  Managing Member

Agreed:

CONSOLIDATED EDISON COMPANY
  OF NEW YORK, INC.

By:     _____
        Name: ROBERT P. STELBEN
        Title: TREASURER

NYC 357317.7 18821 00203