EXIT STRATEGY® CONTRACT

between

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.

and

TRC COMPANIES, INC.

TRC ENGINEERS, INC.

and

TRC ENVIRONMENTAL CORPORATION

Dated as of November 15, 2000

TABLE OF CONTENTS

1.   Definitions. ................................................................................................2

2.   Transfer and Assignment. ..........................................................................9

3.   Release. ....................................................................................................10

4.   Contract Price and Payments. ..................................................................10

5.   TRC's Covenants. ....................................................................................11

6.   Client's Covenants. ..................................................................................15

7.   Consent Order(s) and Site Work Action Plan(s). ....................................16

8.   Insurance/Assurance. ...............................................................................20

9.   Representations and Warranties of TRC. ................................................22

10.  Client's Representations and Warranties. ...............................................24

11.  Indemnity. ................................................................................................25

12.  Client Transfer of Site. ............................................................................27

13.  Commutation of Insurance. ......................................................................27

14.  Limited Adjustments to Site Work. .........................................................29

15.  Independent Contractor. ...........................................................................31

16.  Confidentiality. ........................................................................................31

17.  Notices. ....................................................................................................32

18.  Termination. .............................................................................................33

19.  Governing Law; Jurisdiction; Venue. ......................................................36

20.  Amendment. .............................................................................................36

21.  Severability. .............................................................................................36

22.  Assignment; Successors and Assigns. .....................................................36

23.  Counterparts. ............................................................................................37

24.  Extensions of Time; Schedule; Delays. ...................................................38

25.  Books and Records. ..................................................................................39

26.  Third Party Beneficiary. ..........................................................................39

27.  Key Personnel. .........................................................................................39

28.  Joint and Several Liability of TRC. .........................................................39

29.  Mediation and Review Procedure. ...........................................................40

30.  Written Phase I Completion. ....................................................................41

31.  Exhibits. ...................................................................................................41

Exhibits

Exhibit "A"            —  Listing of Properties
  Exhibit "A-1"        —  Property Description of 616 First Avenue
  Exhibit "A-2"        —  Property Description of 685 First Avenue
  Exhibit "A-3"        —  Property Description of 708 First Avenue
  Exhibit "A-4"        —  Property Description of 700 First Avenue (Waterside)
Exhibit "B"            —  Cost Cap/PLL Policy
Exhibit "C"            —  Client's Policies and Procedures
  Exhibit "C-1"        —  Letter Regarding TRC Oversight Responsibilities
  Exhibit "C-2"        —  Con Edison Standard Terms and Conditions
  Exhibit "C-3"        —  Con Edison Environmental Special Conditions
Exhibit "D"            —  Off-Site Items
Exhibit "E"            —  Schedule for Phase I Completion
Exhibit "F"            —  Wrap Up Insurance Policy
Exhibit "G"            —  Certain Documents Provided by Client to TRC
  Exhibit "G-1"        —  List of Documents Provided by Client
  Exhibit "G-2"        —  Lists of Drawings Provided by Client
Exhibit "H"            —  Certain Items to be Included in Site Work Action Plan
  Exhibit "H-1"        —  685 First Avenue Delivery Specification Plan
  Exhibit "H-2"        —  616 First Avenue Delivery Specification Plan
  Exhibit "H-3"        —  Waterside/708 First Avenue Delivery Specification Plan
Exhibit "I"            —  Defined Additions and Reductions
Exhibit "J"            —  New Condition Coverage Insurance Policy
Exhibit "K"            —  List of Contracts
Exhibit "L"            —  [Omitted]
Exhibit "M"            —  Schedule for Delivery of Possession of Properties to TRC
  Exhibit "M-1"        —  Fuel Oil Depot and Lay Down Area - 616 First Avenue
  Exhibit "M-2"        —  Switch House and Frequency Changer Building - 708
                          First Avenue
Exhibit "N"            —  Specifications for Delivery of Properties to TRC
Exhibit "O"            —  Survey of Easement Areas

# INDEX OF DEFINED TERMS

| TERM | SECTION |
|---|---|
| Affiliate | 1 |
| Books and Records | 25 |
| CEQR | 1 |
| City Datum | IS[1] |
| Client | 18(h) |
| Client Cost Estimate | 13(a) |
| Commutation Account | 1 |
| Conditions | 1 |
| Con Edison | 1 |
| Consent Order | 29 |
| Contesting Party | IS |
| Contract | 4 |
| Contract Price | 1 |
| Contractor Good Faith Efforts | 1 |
| Control | 1 |
| Convenience Termination Payment | 1 |
| Cost Cap/PLL Policy | 1 |
| CPLR | 14 |
| Defined Additions | 14 |
| Defined Reductions | 1 |
| Delay | 1 |
| Demolition and Decommissioning | 1 |
| Demolition and Decommissioning Condition | 7(c) |
| Determination | 12 |
| Developer Owner | 1 |
| Development Depth | 18(h) |
| Earned Cost Savings Amount | 1 |
| Easement Areas | IS |
| Effective Date | 18(c) |
| Event of Default | 3 |
| Excluded Matters | 1 |
| Existing Consent Orders | 1 |
| Governmental Authority | 1 |
| Independent Engineering Firm | IS |
| Insurer | 1 |
| Laws | 5(a) |
| Liens | 1 |
| Long Term Completion | 1 |
| Loss and Expense | 1 |
| Mean High Groundwater Table | |

---

[1] Introductory Statement.

<u>TERM</u>                                                        <u>SECTION</u>

Mediation and Review Procedure ................................................ 29
Mediator ................................................................................ 1
Natural Resource Damages ...................................................... 1
New Conditions Policy .............................................................. 8(a)
Non-Owned Locations ............................................................. 1
NYSDEC ................................................................................ 1
Off-Site Items ....................................................................... 1
Off-Site Locations .................................................................. 1
Owner Delay ........................................................................... 1
Owner Delay Notice ............................................................... 24(b)(i)
Parties ................................................................................... IS
Party ..................................................................................... IS
PCBs ..................................................................................... 1
Person ................................................................................... 1
Phase I Approval .................................................................... 1
Phase I Completion ................................................................ 1
Phase I Work .......................................................................... 1
Policies .................................................................................. 1
Pollutants .............................................................................. 1
Pollution Conditions ............................................................... 1
Pre-Existing Environmental Conditions .................................... 1
Promptly ................................................................................ IS
Properties ............................................................................... IS
Property ................................................................................. 5(e)
RCRA ..................................................................................... 3
Released Parties ..................................................................... 1
Remediation ........................................................................... 1
Remedial Action Plan .............................................................. 1
Remedial Standards ................................................................ Ex. H
Requirements ......................................................................... IS
Sale Agreement ...................................................................... 1
Schedule ................................................................................ 16(b)
SEC ....................................................................................... 1
SEQRA ................................................................................... IS
Site ....................................................................................... 1
Site Developer ....................................................................... 1
Site Work ............................................................................... 1
Site Work Action Plan ............................................................. 1
Subcontractor ........................................................................ 1
Top of Bedrock ...................................................................... IS
TRC ....................................................................................... 18(h)
TRC Cost Estimate ................................................................. 1
TRC Guarantor ....................................................................... 5(o)
TRC Parties ...........................................................................

| TERM | SECTION |
|---|---|
| Unencumbered Development | 1 |
| Vacate Notice | Ex. N |
| VCP | 1 |
| Waterside | IS |
| Wrap Up Program | 8(b) |

## Exit Strategy® Contract

THIS EXIT STRATEGY CONTRACT, including all Exhibits attached hereto (collectively, the "Contract"), is made as of the 15th day of November, 2000 (the "Effective Date") by and between CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. (hereinafter "Client") and TRC COMPANIES, INC., TRC ENGINEERS, INC. and TRC ENVIRONMENTAL CORPORATION (hereinafter collectively "TRC"). Each of Client and TRC shall be referred to individually in this Contract as a "Party" and collectively as the "Parties."

### Introductory Statement

WHEREAS, Client is the owner or lessee of four parcels of real estate in the City of New York commonly described as follows: 616 First Avenue; 685 First Avenue; 708 First Avenue; and 700 First Avenue (the latter hereinafter referred to as "Waterside"). The four parcels, with the improvements thereon, are more particularly described in Exhibit "A," attached hereto and made a part hereof (hereinafter individually referred to as a "Property" and collectively referred to as the "Site" or the "Properties");

WHEREAS, the Site has pre-existing on-Site structures and certain structures that extend off-Site which require demolition and decommissioning in order to address certain environmental conditions;

WHEREAS, the Properties have environmental histories which may have resulted in contamination of one or more of the Properties at levels that may exceed applicable governmental environmental compliance requirements;

WHEREAS, Client has entered into a contract dated as of the date hereof with FSM East River Associates LLC relating to the sale of the Properties (the "Sale Agreement"), which contemplates certain demolition and decommissioning and environmental remediation to be performed with respect to the Properties;

WHEREAS, Client wishes to transfer and assign to TRC any and all liability and responsibility it may have for or associated with the demolition and decommissioning of all on-Site structures and certain structures that extend off-Site, including contractual liabilities and liability under existing or future federal, state and local laws and regulations;

WHEREAS, Client wishes to transfer and assign to TRC any and all liability and responsibility it may have under existing or future federal, state and local laws and regulations for the remediation of the Site, certain off-Site structures and any resultant off-Site pre-existing contamination as may be required to achieve regulatory closure of all such pre-existing contamination;

WHEREAS, TRC wishes to: (i) assume the responsibility to complete demolition and decommissioning of all on-Site structures and certain structures that extend off-Site; (ii) assume the responsibility of Client for remediation of the pre-existing contamination on, under, at or emanating to or from, or existing beyond the boundaries through migration or dispersal originating from, the Site and pre-existing contamination at, on, under or emanating from certain

structures that extend off-Site; (iii) release and indemnify and hold Client harmless from any liability it may have associated with the demolition and decommissioning of all on-Site structures and certain structures that extend off-Site; and (iv) release and indemnify and hold Client harmless from any environmental compliance liability it may have for the pre-existing contamination on, under or emanating to or from the Site; and

WHEREAS, TRC has procured, simultaneously herewith, "cost cap" insurance for the demolition and decommissioning and environmental remediation and pollution legal liability insurance from Granite State Insurance Company ("Insurer") insuring Client, TRC, Site Developer (as defined herein), and other parties.

NOW, THEREFORE, the Parties, in consideration of the mutual covenants set forth below, agree as follows:

1. Definitions.

(a) "Affiliate" means any Person Controlled by, Controlling or under common Control with another Person.

(b) "Conditions" mean all Demolition and Decommissioning Conditions and Pre-existing Environmental Conditions.

(c) "Con Edison" means Consolidated Edison Company of New York, Inc.

(d) "Consent Order" means the administrative consent order(s) to be executed by TRC with Governmental Authorities with jurisdiction for the performance of some or all of the Site Work, as described in Section 7 herein, including activities pursuant to the New York State Voluntary Cleanup Program ("VCP").

(e) "Contractor Good Faith Efforts" means that TRC shall perform the proposed Site Work activities and any other obligations pursuant to this Contract, as requested, except to the extent that they would, in any way, violate any requirements established by Governmental Authorities with jurisdiction and/or result in: (i) an increase in the responsibilities/liabilities of (A) Client beyond those already imposed by the Sale Agreement or this Contract at the Site or otherwise; and/or (B) TRC beyond those already imposed by this Contract at the Site or otherwise; (ii) a material increase in the cost of the Site Work; and/or (iii) an inability of TRC to achieve Phase I Completion in accordance with the Schedule. For purposes of this Contract, additional costs in excess of $10,000 in any one instance and $100,000 in the aggregate shall constitute a "material increase in the cost of the Site Work". If any activities would materially increase the cost of the Site Work, upon Client's and/or Site Developer's request, TRC shall provide Client and Site Developer with satisfactory documentation of such additional costs (notwithstanding Section 25), and at the request of Client or Site Developer under the circumstances specified in Sections 7(a), 7(b), 14(b), and paragraph IV(6) of Exhibit H, TRC shall perform such activity in exchange for an undertaking by Con Edison and/or Site Developer to pay the additional cost of such activity.

(f) "Control" means (i) the direct or indirect ownership of 20% or more of the common shares, membership interests, partnership interests, or other equity of a Person; and/or (ii) the possession directly or indirectly of the power to direct the management and policies of a Person, whether through voting control, contractual rights, a trust, or otherwise.

(g) "Cost Cap/PLL Policy" means that certain Consolidated Edison Company of New York, Inc. First Avenue Properties Policy issued as of the date hereof by Insurer in favor of Client, TRC and Site Developer in the form attached as Exhibit "B", as the same may be modified from time to time in accordance with its terms.

(h) "Convenience Termination Payment" means the following amount:

| | | |
|---|---|---|
| (a) | If the Contract is terminated for convenience (as described in Section 18) within 365 days after the Effective Date and any Consent Order has been executed: | $1,500,000 |
| (b) | If the Contract is terminated for convenience (as described in Section 18) more than 365 days after the Effective Date and any Consent Order has been executed: | $7,500,000 |
| (c) | If the Contract is terminated for convenience (as described in Section 18) before any Consent Order has been executed: | $0 |
| (d) | If the Contract is terminated for convenience (as described in Section 18) after Phase I Completion for all Properties: | $0 |

(i) "CPLR" means the arbitration rules and procedure established at Article 75 of the New York Civil Practice Law and Rules (N.Y.Civ.Prac.L.&R. § 7501 et seq. (McKinney 2000)).

(j) "Delay" means any obstruction, prevention, hindrance, action and/or inaction which results in delay in the performance, or results in the nonperformance, of TRC's obligations pursuant to this Contract.

(k) "Demolition and Decommissioning" means the investigation, study, removal, treatment, decommissioning and demolition of (and the abatement of Pollutants on): (i) all above ground and subsurface items, including, but not limited to, buildings, structures, enclosures, foundations, platforms, slabs, improvements, conduits, inactive utility lines and edifices of any kind whatsoever with respect to the Site at and above the Development Depth, (ii) the water tunnels at Waterside, the fuel oil tank at 616 First Avenue, and all building slabs (and all associated columns, piers and/or other structures to the bottom of the slabs), and (iii) the Off-Site Items to the extent required by Governmental Authorities with jurisdiction and, with respect to (i) through (iii) above, the treatment, storage, disposal, recycling, re-use, reconditioning and/or reclamation of same off-Site.

(l) "Demolition and Decommissioning Condition" means the presence of all above ground and subsurface items, including, but not limited to, buildings, structures, enclosures, foundations, platforms, slabs, improvements, conduits, inactive utility lines and edifices of any kind whatsoever with respect to the Site at and above the Development Depth, (ii) the water tunnels at Waterside, the fuel tank at 616 First Avenue, and all building slabs (and all associated columns, piers and/or other structures to the bottom of the slabs), and (iii) the Off-Site Items.

(m) "Development Depth" means the higher of : (1) sixteen (16) feet below grade; (2) Top of Bedrock; and (3) depth to the Mean High Groundwater Table.  The Development Depth may vary from location to location on any Property.

(n) "Easement Areas" means those portions of Waterside shown as easement areas on that certain survey of Waterside made by Earl B. Lovell - S.P. Belcher, Inc. dated January 10, 1999, attached hereto as Exhibit "O".

(o) "Existing Consent Orders" means the following NYSDEC Administrative Orders on Consent: (i) NYSDEC Index No. R2-1023-88-06 et seq. dated 11/4/94 and (ii) NYSDEC Index No. D2-0003-96-12 et seq. dated 10/23/97.

(p) "Governmental Authority" means the United States; the State of New York; the City of New York; any political subdivision of any of the foregoing; and any federal, state, or local governmental authority, instrumentality, or commission, or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

(q) "Independent Engineering Firm" means a firm of licensed engineers with at least ten years' experience relating to Remediation of industrial properties in the State of New York, which shall be selected by Con Edison, TRC and Site Developer within forty-five days after the date hereof. If the Parties and Site Developer cannot agree upon an Independent Engineering Firm within forty-five days, any of them may commence arbitration to select the Independent Engineering Firm pursuant to the rules of the American Arbitration Association ("AAA") by application to the New York, New York chapter of the AAA.

(r) "Laws" means all applicable federal, state, provincial, and/or local statutes, rules, regulations, ordinances, or any binding judicial or administrative interpretations thereof, or any binding judicial or administrative order, decree, agreement, judgment, writ, injunction or ruling.

(s) "Long Term Completion" means:

(i)    Demolition and Decommissioning to allow Unencumbered Development of the Site; and

(ii)    Remediation as necessary to allow Unencumbered Development of the Site, and resulting in:

(1) written approval from Governmental Authorities exercising jurisdiction over the Site Work, that no further action (including all requirements for post-remediation monitoring) is required at the Site under Law; and

(2) completion of Remediation to the Remediation Standards in accordance with Exhibit "H" of Off-Site Locations and Off-Site Items.

(t) "Loss-and-Expense" means claims, costs, damages, expenses, judgments, liabilities, losses, costs of Delay, obligations, fees, charges, taxes, expenses, fines and penalties, of any nature or kind whatsoever, whether direct or indirect, including, but not limited to, consequential damages and legal costs and expenses (including the costs of enforcement of the indemnities provided herein).

(u) "Mean High Groundwater Table" means that level represented by the Mean High Water Level in the East River at East 41st Street in New York City, at an elevation of –0.4 feet referenced to the Manhattan Highway datum (City Datum).

(v) "Mediator" means a licensed engineer with at least ten years' experience relating to Remediation of industrial properties in the State of New York, and who has not been retained or employed by Con Edison, Site Developer or TRC or any of their respective affiliates within the past five years. The Mediator shall be selected within forty-five days after the date hereof. If the parties fail to agree within such forty-five day period, at the request of either Party or Site Developer, each of Site Developer, TRC and Con Edison shall recommend a Mediator and one of the three recommended Persons shall be selected randomly.

(w) "Natural Resource Damages" means: (1) physical injury to or destruction of, including the resulting loss of value of, land, fish, wildlife, biota, air, water, groundwater, drinking water supplies; (2) physical injury to or destruction of other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Conservation and Management Act (16 U.S.C. §§ 1801 et seq.)), any state or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe; and (3) the cost, charges and expenses for assessment associated with any items identified in (1) and (2) herein.

(x) "Non-Owned Locations" refers to property or geographical locations that are used for treatment, storage, disposal, recycling, re-use, reconditioning and/or reclamation, which are neither owned nor operated by Client and which are identified in the Non-Owned Locations Schedule which, subsequent to the Effective Date, will be attached to and made part of the Cost Cap/PLL Policy.

(y) "NYSDEC" means the New York State Department of Environmental Conservation.

(z) "Off-Site Items" means the items described in Exhibit "D" which are not located on the Site but are included in the scope of the Site Work.

(aa)    "Off-Site Locations" refers to property or geographical locations or waterways beyond the boundaries of the Site impacted by Pollutants emanating from, or existing beyond the boundaries through migration or dispersal originating from, the Site.

(bb)    "Owner Delay" means Delay in the performance of the Site Work caused by or resulting from:

(i)    failure of Client to comply in a timely manner with any of its covenants in Section 6;

(ii)    (A) failure to obtain approvals pursuant to the State Environmental Quality Review Act, N.Y. Envtl. Conserv. Law §§8-0101 et seq. ("SEQRA") or the City Environmental Quality Review, N.Y.C. Executive Order No. 91 (August 24, 1977), as amended, Rules of Proc. For City Envtl. Quality Review, 43 Rules of City of N.Y. §§ 5-01 et seq. (1991) ("CEQR") that are required to perform the Site Work (if any), or (B) a legal or administrative proceeding in connection with SEQRA or CEQR, or (C) any agreement entered into by Client or Site Developer (with Governmental Authorities or otherwise) in connection with a pending SEQRA or CEQR proceeding (for example, an agreement by Site Developer to perform additional Remediation not required by this Contract or Governmental Authorities in exchange for additional development rights); provided, however, that in the case of (A), (B) or (C) above the time required for TRC to perform Remediation imposed by a Governmental Authority with jurisdiction during or as a part of the SEQRA/CEQR process shall not constitute Owner Delay;

(iii)    the occurrence of a Pollution Condition that, pursuant to Section 7(c) herein, is determined: not to be Pre-existing Environmental Condition and to have been caused by Client;

(iv)    any injunction or legal or administrative proceeding against Client and/or Site Developer, other than an injunction or legal or administrative proceeding the subject of which is any act or omission of TRC or the TRC Parties (it being understood that Delay resulting from an injunction or legal or administrative proceeding against TRC or the TRC Parties which is obtained or commenced (as applicable) solely to prohibit or restrict:  (A) future development or changes in the zoning status of the Properties; or (B) the decommissioning of Waterside; or (C) the repowering of the East River generating station, shall constitute Owner Delay);

(v)    failure of Client or Site Developer (as applicable), to provide notice or consent in a timely manner pursuant to Section 11(c) of the Contract;

(vi)    activities performed by Client at the Site in accordance with Section 6(a); provided, however, that if the nature or duration of Client's proposed activities at the Site would cause an Owner Delay, in order for TRC to make a claim for Owner Delay, TRC shall be required to notify Client that an Owner Delay may result from its activities prior to providing Client access to the Site;

(vii)    construction of an access shaft to City water tunnel #3 by the New York City Department of Environmental Protection on any Property.

(cc)    "Person" means an individual person, a corporation, partnership, limited liability company, trust, joint venture, proprietorship, estate, government entity, or other incorporated or unincorporated enterprise, entity or organization of any kind whatsoever.

(dd)    "Phase I Approval" means (i) written approval from NYSDEC (and all other Governmental Authorities lawfully asserting jurisdiction over the Site which have imposed Remediation requirements as to Unencumbered Development) allowing Unencumbered Development of the Properties, subject to long term monitoring, Remediation or other requirements, on-Site and off-Site, consistent with Exhibit H and which do not in any way, hinder, limit, impede, inhibit or restrict Unencumbered Development, or (ii) the certifications of TRC and the Independent Engineering Firm described in Section 30.

(ee)    "Phase I Completion" means the completion of the Phase I Work, as evidenced by issuance of the Phase I Approval and completion of Demolition and Decommissioning to the delivery specifications set forth in Exhibit "H".

(ff)    "Phase I Work" means all Site Work necessary to achieve Phase I Approval and Demolition and Decommissioning in accordance with Exhibit "H".

(gg)    "Policies" means the Cost Cap/PLL Policy, the New Conditions Policy and the Wrap Up Program.

(hh)    "Pollutants" means any solid, liquid, gaseous or thermal chemical, irritant, contaminant, substance, material or waste, including smoke, vapors, soot, fumes, dusts, acids, alkalis, hazardous or toxic chemicals, substances, irritants, contaminants or wastes, and any by-products or progeny thereof, including but not limited to, oils, hydrocarbons and petroleum products and by-products, asbestos and asbestos-containing materials; urea formaldehyde foam insulation; lead and lead-based paint; metals; mercury; cyanide; and polychlorinated biphenyls ("PCBs").

(ii)    "Pollution Conditions" means the presence, introduction, migration, disposal, discharge, dispersal, release or escape of any Pollutants at, on, under, or emanating to or from, or existing beyond the boundaries through migration or dispersal originating from, the Site (including the land, soil or sediment, or any above ground or subsurface structure, or the atmosphere or any watercourse or body of water, including groundwater), including historic fill and/or any Pollutants contained therein or emanating therefrom, in all cases provided that such conditions are: (i) not naturally present conditions; or (ii) present above the naturally occurring background levels for a constituent in the environment at the Site.

(jj)    "Pre-existing Environmental Condition" means the Pollution Conditions existing prior to the Effective Date hereof, whether known or unknown, including the effects of continuing releases of Pollutants that exist as of the Effective Date hereof and are continuing to result in the movement, migration, discharge, dispersal, release or escape of Pollutants.

(kk)    "Promptly" means as soon as reasonably practical under the circumstances, but in no event longer than thirty days.

(ll) "Remedial Action Plan" means the plan or plans describing the Remediation, prepared pursuant to the terms of Section 7(b), and consistent with the terms of the Consent Order(s) and the Contract.

(mm) "Remediation" means the investigation, feasibility study, preparation of a Site Work Action Plan, clean-up, removal, disposal, treatment (including in-situ and ex-situ) or neutralization of all Pollutants on-Site, at Off-Site Locations and with respect to Off-Site Items, in all cases to the Remediation Standards including, but not limited to, any monitoring, operations and maintenance activities that may be required after the completion of such investigation, feasibility study, clean-up, removal, disposal, treatment or neutralization, as well as the performance of any and all obligations imposed by any Governmental Authority, including obligations imposed pursuant to the Existing Consent Orders and obligations imposed pursuant to a validly executed voluntary clean-up agreement, plan or Consent Order negotiated with a Governmental Authority or voluntary clean-up directed by an authorized representative of a Governmental Authority.

(nn) "Remediation Standards" means those remedial and/or clean-up standards established by Governmental Authorities with jurisdiction over the Site Work which will permit residential Unencumbered Development of the Site, including site-specific standards approved for such residential use by NYSDEC and any other Governmental Authority with jurisdiction.

(oo) "Schedule" means the schedule for the performance of TRC's obligations through Phase I Completion attached hereto as Exhibit "E", as the same may be amended in accordance with Section 24.

(pp) "Site Developer" means FSM East River Associates LLC, any designee of FSM East River Associates LLC which takes title to a Property, and their respective permitted successors and assigns.

(qq) "Site Work" means all activities and obligations incurred pursuant to and included in Remediation and Demolition and Decommissioning and any changes permitted and approved (if required) pursuant to this Contract.

(rr) "Site Work Action Plan" means the Remedial Action Plan and those plans describing the Demolition and Decommissioning to be prepared by TRC. The Site Work Action Plan(s) (as modified in accordance with this Contract) shall be consistent with and attached to and form a part of the Contract.

(ss) "Subcontractor" means every Person (other than employees of TRC) employed by TRC, or by any Person working with TRC, including every sub-subcontractor of whatsoever tier, for any portion of the Site Work, whether for the furnishing of labor, materials, equipment, services, or otherwise.

(tt) "Top of Bedrock" means the upper surface of "intermediate rock" as defined in § 27-675(a)(3) of the New York City Administrative Code, and indicated as a 3-65 class of material in Table 11-2 of §27-678 of the New York City Administrative Code.

(uu)  "TRC Guarantor" means TRC Companies, Inc.

(vv)  "Unencumbered Development" means the ability to redevelop the Site for residential and commercial uses to the Development Depth (and the ability to drive pilings to the Top of Bedrock and/or, subject to Exhibit "H", to install caissons) without: (i) the requirement for any additional consent, approval, authorization or similar precondition for such uses on-Site at or above the Development Depth from any Governmental Authority with jurisdiction respecting Pollution Conditions or Remediation or (ii) except as set forth in Exhibit "H," any limitation, restriction, condition, requirement or institutional control of any type on development at or above the Development Depth.

(ww)  Wherever used in this Contract:

(i)  the words "include" or "including" shall be construed as incorporating, "also," "but not limited to" or "without limitation";

(ii)  the word "day" means a calendar day unless otherwise specified;

(iii)  the phrase "at TRC's expense" or "at Client's expense," means, as applicable, at the sole cost and expense of the particular party;

(iv)  the word "notice" shall mean notice in writing (whether or not specifically so stated);

(v)  the word "month" means a calendar month unless otherwise specified;

(vi)  the word "amended" means "amended, modified, extended, renewed, changed, or otherwise revised"; and the word "amendment" means "amendment, modification, extension, change, renewal, or other revision";

(vii)  the phrase "subject to the terms of this Contract" means "upon and subject to all terms, covenants, conditions and provisions of this Contract and any and all Exhibits attached thereto";

(viii)  the words "utility" (or "utilities") means gas, water, chilled water, sewer, electricity, steam, power, and other utilities of any kind;

(ix)  the words "approval," "approve," and "consent" shall mean approval, approve, or consent in writing (whether or not so specified); and

(x)  references to "dollars" or "$" mean United States dollars.

## 2. Transfer and Assignment.

(a) Client hereby transfers and assigns to TRC, and TRC hereby accepts and assumes, subject to the terms of this Contract, complete and sole responsibility for performance of the Site Work, including Phase I Completion and Long Term Completion.

(b) Except as provided for in the Cost Cap/PLL Policy described herein at Section 8(a) and the independent rights and obligations of Client, Site Developer and TRC to said insurance, as set forth herein, the transfer and assignment set forth above does not include the transfer or assignment of any rights to insurance proceeds that Client or Site Developer may have against their insurer(s), or any claims against third parties including, without limitation, claims against future owners and/or parties with any interest in, or obligation associated with, the Site. It is the intent of the Parties that Client and Site Developer retain these rights completely. Notwithstanding the foregoing, TRC retains the right to defend itself against claims brought by such insurers or third parties.

(c) Client hereby assigns and transfers to TRC, effective as of the date hereof, all right, title and interest of Client in and to the contracts relating to Remediation and/or Demolition and Decommissioning listed in Exhibit "K" hereto, and TRC hereby assumes such contracts and agrees to perform and pay all obligations of Client arising or accruing under such contracts from and after the date hereof.

3.  Release.

TRC hereby releases Con Edison, its affiliates, parents, subsidiaries, and its successors and assigns, and their respective officers, directors, trustees, shareholders and employees and the Site Developer, its principals, lenders, successors, assigns, affiliates, parer ., subsidiaries, members, managers and partners, and their respective officers, directors, shareholders, members, managers, partners and employees (collectively, the "Released Parties") for all Loss-and-Expense on account of, with respect to, or in any way connected with the Pre-existing Environmental Conditions or arising out of the Site Work. The foregoing release shall not apply to Loss-and-Expense relating to any suits, claims, demands or causes of action for: (a) Natural Resource Damages; or (b) bodily injury or property damage arising out of, with respect to, or in connection with, Natural Resource Damages or Pre-existing Environmental Conditions (to the extent brought by parties other than Governmental Authorities) (collectively, "Excluded Matters"). Notwithstanding the foregoing, Excluded Matters shall be covered by the foregoing release in the event such suits, claims, demands or causes of action are: (x) for Remediation, including Remediation of natural resources, (y) caused by or are the result of any actions TRC may undertake pursuant to this Contract or any omission, mistake or negligence of TRC pursuant to its performance of the Contract; or (z) brought by TRC's employees or Subcontractors.

In addition, the foregoing release shall not be construed to include, with respect to any Property, fees, monetary assessments, fines, penalties and/or oversight costs as a result of requirements of Governmental Authorities imposed upon Con Edison for the period prior to the date of delivery of possession of such Property to TRC.

4.  Contract Price and Payments.

(a) Except as set forth in Section 14 herein, Con Edison has paid the sum of One Hundred Three Million Five Hundred Thousand Dollars ($103,500,000) (the "Contract Price") for the assumption by TRC of the obligations set forth herein (which includes all premiums for the Cost Cap/PLL Policy). TRC acknowledges that the Contract Price has been paid directly to Insurer.

TRC and Client agree that Insurer shall be solely responsible for paying TRC for the performance of the Site Work, subject to Section 14 and subject to and in accordance with the terms of the Policies. TRC agrees that TRC shall have no claim against Client and/or Site Developer in the event that Insurer fails to pay all or any portion of such amount to TRC. TRC hereby agrees that the failure of the Insurer to pay TRC all or a portion of such amount shall not be a basis to stop work or fail to perform any other of TRC's obligations under this Contract. In the event of any dispute between TRC and Client and/or Site Developer with respect to the Site Work or any other aspect of this Contract, TRC shall continue to prosecute the Site Work and perform its other obligations under the Contract during the pendency of such dispute.

(b) Unless specified to the contrary elsewhere in this Contract, TRC shall bear the entire expense of the Site Work; and TRC agrees that the Contract Price shall be TRC's entire compensation from Client and/or Site Developer for the performance of the Site Work, the purchase of the Cost Cap/PLL Policy and all other insurance described in this Contract, the costs of all permits and approvals, all general conditions costs, and all profits and Loss-and-Expense which will, might, or could be earned or incurred by TRC and all Subcontractors under or by reason of the Contract. TRC agrees that amounts received by TRC in payment of the Contract Price shall be held in trust pursuant to Section 13 of the Lien Law of New York State and shall be used first (i.e., before application for any other purpose) to pay for labor, materials, services, or equipment furnished in connection with the Site Work (or any portion thereof).

**5. TRC's Covenants.**

TRC covenants and agrees:

(a) To undertake, perform, and complete the Site Work and achieve Phase I Completion and Long Term Completion in a good and workmanlike manner, and in accordance with current good standards of practice, all provisions and requirements of the Site Work Action Plan, and the Schedule. TRC warrants and agrees that the Site Work shall satisfy the requirements of the Site Work Action Plan and shall (without limitation): (a) be free from fault and defects, latent or otherwise; (b) be free of liens, security interests and encumbrances ("Liens") caused or created by TRC or any Subcontractor; and (c) comply with, and be completed by means and methods complying with, Laws, the Consent Orders and applicable insurance requirements.

(b) Except as set forth in Exhibit "H", to refrain from imposing any deed restriction or any other institutional or engineering controls otherwise permitted pursuant to applicable Laws upon any of the Properties that would in any way hinder, condition, restrict, limit, impede, or inhibit Unencumbered Development of the Site;

(c) To negotiate and, subject to Section 7(b) below, execute a Consent Order(s) to perform the Site Work;

(d) To satisfy and accept sole responsibility to meet the notification requirements delineated in the Cost Cap/PLL Policy for Coverages K and L for all Conditions discovered or otherwise known to TRC or reported to TRC by another Insured (as defined in the Cost Cap/PLL Policy), and all other obligations of the Insureds with respect to Coverages K and L in the Cost

Cap/PLL Policy and in the Wrap Up Program; provided that nothing herein shall be construed as preventing Con Edison or Site Developer from providing such notification to the Insurer;

(e) To obtain, in its name, an identification number pursuant to the federal Resource Conservation and Recovery Act ("RCRA") (42 U.S.C. § 6901 et seq.) and analogous New York Law for the treatment and/or disposal of Pollutants and execute all Pollutant manifests, as the waste generator, necessary to perform the Site Work;

(f) To provide Client and Site Developer access to monthly progress reports which, at a minimum, identify the work completed to date, the monthly and year-to-date costs incurred in the performance of the Site Work, and Site Work costs paid under the Cost Cap/PLL Policy, and to invite Client and Site Developer to all project meetings;

(g) To coordinate and cooperate with Client and Site Developer in the planning and execution of the Site Work and to use: (i) best efforts to minimize and/or avoid interference with or disruption of Client's current operations at any of the Properties and (ii) Contractor Good Faith Efforts to minimize and/or avoid interference with other activities at the Properties;

(h) To comply fully with Client's policies and procedures as set forth in Exhibit "C" attached hereto and made a part hereof, and Laws governing conduct of the Site Work;

(i) To develop, negotiate and execute a Remedial Action Plan in accordance with Section 7 herein;

(j) To achieve Phase I Completion in accordance with the Schedule;

(k) To identify and obtain, at TRC's sole cost and expense, all necessary authorizations, approvals and permits, as well as any modifications or amendments thereto, necessary for the performance of the Site Work to achieve Phase I Completion and Long Term Completion, and to accept sole and complete responsibility and liability for any and all requirements, obligations and costs associated with same;

(l) To use Contractor Good Faith Efforts to cooperate with Client, and Site Developer if applicable, in assessing the terms of this Contract and the Cost Cap/PLL Policy so as to maximize all potential benefits that could be realized pursuant to the applicable provisions of the Internal Revenue Code (26 U.S.C. §§ 1 et seq.);

(m) To satisfy and comply with the terms and conditions delineated at Exhibit "H";

(n) To accept sole responsibility and liability for any extensions of any utilities and any other capital improvements needed by TRC to conduct the Site Work;

(o) To accept sole responsibility and liability for any and all responsibilities, requirements, obligations and Loss-and-Expense caused by or arising as a result of any actions taken pursuant to this Contract by, or any omission, mistake or negligence of, TRC or its officers, agents, employees or Subcontractors (collectively "TRC Parties") pursuant to its performance of the Contract;

NYC 357354.10 18821 00203

(p) To comply with all terms of and maintain in effect the Cost Cap/PLL Policy and all other insurance described in this Contract and to ensure that the insurance coverage to be maintained by TRC pursuant to Section 8(b) herein includes complete and adequate coverage for any interruption of Con Edison's and/or Site Developer's business to the extent resulting from a breach of professional duty by TRC or its Subcontractors. This obligation to maintain business interruption insurance shall remain in effect with respect to Con Edison (and shall also apply with respect to Developer Owner) in the event of a transfer in ownership of any Property(ies) and shall not affect the rights of Con Edison under Section 5(s) in the event TRC fails to achieve Phase I Completion in accordance with the Schedule;

(q) To be fully responsible for every portion of the Site Work furnished by its Subcontractors and for every act and omission (whether willful, negligent or otherwise) of every Subcontractor and such Subcontractor's employees. TRC shall be solely responsible for settling jurisdictional disputes and maintaining labor harmony at the Site. If any Subcontractor or any other person claiming to have been employed (directly or indirectly) by or through TRC files a Lien, TRC shall satisfy, remove or discharge such Lien at TRC's expense by bonding, payment or otherwise within ten days after notice to TRC of the filing thereof. If TRC fails to do so, Client and/or Site Developer may satisfy, remove or discharge such Lien, and TRC shall pay the cost of same to Client and/or Site Developer, as appropriate, upon demand;

(r) To make the following efforts to: (i) cause Site Developer to be a party to the Consent Order(s) with no obligations thereunder and (ii) obtain a Covenant Not to Sue in connection with Pollution Conditions, from the Governmental Authority exercising jurisdiction over the Site Work, for the benefit of the Site Developer, and, if possible, Client; it being acknowledged that decisions regarding Covenants Not to Sue are subject to the discretion of such Governmental Authority: (A) apply for admission to the VCP; (B) agree to NYSDEC's standard form of consent order under the VCP (unless TRC can negotiate more favorable terms within the VCP); (C) prepare plans and other documentation as required by NYSDEC; (D) as part of the negotiation of the Consent Order(s), request that NYSDEC deliver a Covenant Not to Sue applicable to each Developer Owner and Client; and (E) perform the Site Work in accordance with the Remedial Action Plan and perform any additional tasks required by NYSDEC and/or any other Governmental Authority with jurisdiction as a condition to obtaining such Covenant Not to Sue to the extent consistent with the Contract;

(s) To be liable for all Loss-and-Expense incurred by Client and Site Developer as a result of the failure to achieve Phase I Completion in accordance with the Schedule, except to the extent of that portion of Loss-and-Expense attributable to Owner Delay. Notwithstanding the preceding sentence, the total maximum Loss-and-Expense for which TRC shall be liable under this Section 5(s) shall not exceed $25,000,000 in the aggregate, and Client and Site Developer shall only be entitled to seek recovery of such Loss-and-Expense from the Cost Cap/PLL Policy (and not from TRC). In the event of Owner Delay, TRC shall remain responsible for completion of the Site Work at the Contract Price (subject to Section 24(f)) and in accordance with all terms and conditions of the Contract, except the Site Work shall be completed in accordance with the revised Schedule as required to be provided pursuant to Section 24 herein. The provisions of this Section 5(s) set forth the sole remedy of Client and Site Developer for all Loss-and-Expense incurred due to Delay;

(t)  To perform the obligations of TRC set forth elsewhere in this Contract and the Cost Cap/PLL Policy;

(u) To indemnify the Released Parties in accordance with the provisions of Section 11 herein;

(v) To diligently assist Client and/or Site Developer in opposing any attempt to list one or more of the Properties on the New York State Inactive Hazardous Waste Site Registry, the National Priorities List, and/or any similar list or registry, and to the extent possible, diligently undertake any Remediation which will preclude such listing, including any required remediation or removal of Pollutants;

(w) Upon thirty days prior notice of an intent to transfer ownership in a Property(ies) from Client to a Developer Owner, to prepare and provide a comprehensive list of all authorizations, approvals, permits and other documentation with respect to the Site Work necessary to transfer same;

(x) To provide representatives of Con Edison and Site Developer access to all items described in Section 5(f) and access to the Site at all times while the Site Work is in progress, in accordance with TRC's site procedures for purposes of conducting oversight activities;

(y) To provide information and access to the Site to the Independent Engineering Firm, in accordance with TRC's site procedures, as necessary for the Independent Engineering Firm to perform its responsibilities under Section 30;

(z) Except as set forth in Exhibit "H"(II)(B)(1), prior to transfer of a Property to a Developer Owner, not to enter into any agreement with Site Developer and/or any Developer Owner with respect to such Property (or any amendment thereto) without the prior written consent of Con Edison, which consent shall not be unreasonably withheld provided that such contract or amendment: (i) shall not interfere with TRC's ability to achieve Phase I Completion in accordance with the Schedule, (ii) shall not violate SEQRA/CEQR, (iii) shall not expose Con Edison to additional liability, and (iv)  at Con Edison's election (A) shall be an "Insured Contract" under the Cost Cap/PLL Policy (and Con Edison shall not be responsible for payment of additional premiums in connection with same) or (B) shall be covered by a separate cost cap/pollution legal liability insurance policy obtained at the sole expense of Site Developer and/or Developer Owner(s) in form reasonably acceptable to Con Edison which names Con Edison as an additional named insured.  If TRC enters into any such agreements with Site Developer and/or Developer Owner, TRC shall maintain separate Books and Records and job meeting minutes and shall conduct separate job meetings with respect to such agreements. Con Edison's consent to any such agreement shall not excuse TRC from its obligation to achieve Phase I Completion in accordance with the Schedule or its obligation to pay Loss-and-Expense associated with same pursuant to Section 5(s).

(aa)  After transfer of title to a Property to a Developer Owner has occurred, not to enter into any agreement with Site Developer and/or Developer Owner with respect to such Property (or any amendment thereto) unless such contract or amendment, at Con Edison's

election (i) is an "Insured Contract" under the Cost Cap/PLL Policy (and Con Edison shall not be responsible for payment of additional premiums in connection with same) or (ii) is covered by a separate cost cap/pollution legal liability insurance policy obtained at the sole expense of Site Developer and/or Developer Owner(s) in form reasonably acceptable to Con Edison which names Con Edison as an additional named insured.

(bb)    To use Contractor Good Faith Efforts to accommodate the schedules, notice and comment provisions in this Contract when negotiating with Governmental Authorities.

## 6. Client's Covenants.

Client covenants and agrees:

(a) To deliver possession of each Property to TRC in accordance with the schedule in Exhibit "M" and the Delivery Specifications in Exhibit "N". After any Property has been delivered to TRC and Con Edison has removed its vehicles and personnel in accordance with Exhibit "N", Client shall not enter any Property (or the portion thereof that has been vacated) except for oversight purposes and as described in the following sentence. If Con Edison elects the Defined Reduction in paragraph A(6) of Exhibit "I", Con Edison may enter Waterside only to service, maintain and repair active utilities in the Easement Areas and Con Edison may conduct such activities thereon only as and when permitted by TRC (in TRC's reasonable discretion) upon at least 24 hours advance notice to TRC (except in the event of emergency), and in accordance with TRC's site procedures. It is understood that TRC shall schedule Client's access to and activities at Waterside in order to avoid Delay;

(b) To accept deed restrictions or any other institutional or engineering controls consistent with Exhibit "H";

(c) To cooperate with TRC in connection with the use of utilities at the Site; to allow TRC to utilize, at no cost, the existing utilities (if any) at each Property prior to transfer of title to such Property; and Con Edison agrees to supply TRC with electricity required for the Site Work at each Property through Phase I Completion (regardless of whether title to any Property is transferred prior to Phase I Completion);

(d) To provide TRC at least three days' prior notice, where possible, of all Client communications with Governmental Authorities concerning TRC's obligations; to provide TRC the right to attend all meetings between Client, Site Developer and Governmental Authorities concerning TRC's obligations pursuant to this Contract; and to refrain from communicating with Governmental Authorities concerning TRC's obligations pursuant to this Contract, including but not limited to the Consent Order(s) and the Site Work Action Plan, in a manner that interferes with TRC's efforts to negotiate, implement and complete its obligations with respect to same in accordance with this Contract (it being understood that this Section shall not be deemed to restrict the rights of Client, Site Developer and their respective counsel to communicate and meet with Governmental Authorities with respect to other projects and matters);

(e) To cooperate (at TRC's sole expense) in obtaining, and to execute, those permits, permit modifications, permit amendments and/or Consent Order(s) as may be necessary to allow TRC to implement and complete the Site Work, provided that TRC shall accept sole and complete responsibility and liability for all responsibilities, requirements, obligations and costs associated with same, and provided, further that, with respect to Consent Order(s), such Consent Order(s) comply with the terms of this Contract and TRC has complied with Section 7 in preparing and negotiating same;

(f) To accept the terms and conditions delineated at Exhibit "H" herein which reflect the intention of the Parties and shall be binding upon them in the event that there is a dispute between TRC, Client and/or Insurer concerning actions taken pursuant to this Contract;

(g) To use good faith efforts to identify the location of active utility lines of Client on each Property, in each case within thirty days after delivery of the Vacate Notice with respect to such Property (or portion thereof) or with respect to the fuel oil depot and lay down area and the switch house and frequency changer building, before the applicable date of delivery for such areas set forth in Exhibit "M";

(h) Not to store Pollutants from other facilities of Client on the Site;

(i) Not to agree with Governmental Authorities to modify the Site Work Action Plan or the Consent Order(s) except in accordance with Section 14;

(j) To provide TRC with access to each Property prior to the date that possession of such Property is delivered to TRC upon five days' prior notice to Client in accordance with Client's site procedures and its policies applicable to TRC's proposed activities at the Property, in a manner and at times which minimize interference with Client's operations;

(k) To provide TRC with access to information requested by TRC which is in the possession of Client and applicable to the performance of the Site Work; provided, however, that Client shall have no liability hereunder for the accuracy, completeness, or failure of Client to locate, any requested information (and Client's delay in complying or failure to comply with this covenant shall not constitute an Owner Delay).

7. **Consent Order(s) and Site Work Action Plan(s).**

(a) Consent Order.

    (i)    TRC shall negotiate and execute Consent Order(s) addressing each Property with NYSDEC consistent with the terms and conditions of this Contract.

        (1) TRC shall provide the Client and the Site Developer reasonable advance notice of all meetings with Governmental Authorities regarding the Consent Order(s) and the Site Work Action Plan(s) and a right to attend all such meetings. Client and Site Developer shall not have speaking roles at such meetings (unless agreed to by TRC in advance, in TRC's sole discretion). Client and Site Developer agree to send only the same type of representatives (i.e., lawyers,

principals, engineers) which TRC and/or Governmental Authorities are sending to such meeting.

(2) TRC shall not execute a Consent Order for or otherwise cause responsibilities or obligations to be imposed by a Governmental Authority upon any Property prior to the date that TRC is delivered possession of such Property (or portion thereof) for the performance of the Site Work as set forth in the schedule provided at Exhibit "M."

(3) Under no circumstances shall Client be required to execute a Consent Order applicable to any Property prior to the applicable date of delivery of possession of such Property (or portion thereof) to TRC set forth in Exhibit "M."

(4) Under no circumstances shall the terms and provisions of the Consent Order impose upon Client and/or the Site Developer any obligations, responsibilities or liabilities unrelated to the Properties, the Off-Site Items, the Off-Site Locations or as otherwise provided under this Contract.

(5) Although the Client and the Site Developer may be signatories to such Consent Order(s), TRC shall retain sole responsibility and liability for the obligations incurred thereunder pursuant to the terms of this Contract.

(ii)    TRC shall provide to Client and Site Developer a draft of the Consent Order(s) for review.  Site Developer and Client shall provide their comments concerning the draft Consent Order(s) to TRC within seven days of receipt of the draft Consent Order(s).  TRC shall incorporate such comments into the Consent Order(s) to the extent consistent with the terms, conditions and provisions of the Contract, and TRC shall deliver the revised Consent Order(s) to Client and Site Developer for review at least fourteen days prior to submission to NYSDEC.  In the event that Client and/or Site Developer believe that such revised Consent Order(s) are not consistent with the terms of this Contract, Client and/or Site Developer (as applicable) shall notify TRC within four days after receipt of the revised Consent Order(s) how such Consent Order(s) should be revised to be consistent with the Contract.  If TRC does not provide notice to Client and/or Site Developer (as applicable) within four days thereafter that it will so modify the Consent Order(s), the sole remedies of Client and/or Site Developer shall be (A) to commence the Mediation and Review Procedure described in Section 29 hereof prior to the end of the fourteen day period, or (B) if Client and/or Site Developer believe that NYSDEC will agree to modify the Consent Order(s) if TRC undertakes action which would materially increase the cost of the Site Work, to agree subject to the provisions of Section 5(z) prior to the end of such fourteen day period to pay the increase in the cost to TRC pursuant to a separate agreement if NYSDEC will agree to modify the Consent Order(s), in which case TRC shall use Contractor Good Faith Efforts to obtain NYSDEC's approval, and if successful TRC shall take the action required to modify the Consent Order(s).  Time shall be of the essence with respect to Client's and Site Developer's communications to TRC under this Section 7(a)(ii), it being understood that if Client or Site Developer fails to notify or respond to TRC or commence the Mediation and Review Procedure (as

applicable) within the time periods set forth herein, such rights shall be deemed waived. In the event that the time periods within which NYSDEC (or other Governmental Authorities with jurisdiction) requires TRC to act with respect to any matter are shorter than the time periods provided in this Section, TRC shall so notify Client and Site Developer and the time periods within which the parties must act in this Section shall be decreased accordingly but shall not be eliminated.

(iii)    In the event that TRC complies with its obligations in Section 5(r) but is unable to obtain a Covenant Not to Sue in favor of Site Developer with respect to any Property(ies), TRC shall notify Site Developer. Site Developer shall have the right, for a period of thirty days upon notice to TRC (given within five days after receipt of TRC's notice), to negotiate with NYSDEC for a commitment in the Consent Order(s) to issue Site Developer a Covenant Not to Sue with respect to such Property(ies), notwithstanding Section 6(d) (except that TRC shall be given notice and a right to attend any meeting between Site Developer and NYSDEC). If Site Developer exercises this right, TRC shall be entitled to an extension of the Phase I Completion dates set forth in the Schedule with respect to the applicable Property(ies) for the number of days that Site Developer seeks to obtain the Covenant Not to Sue (but such action shall not entitle TRC to reimbursement under Section 24(f)).

(b) Remedial Action Plan(s). TRC shall develop Remedial Action Plan(s) addressing all Pollution Conditions. The Remedial Action Plan(s) shall be consistent with all of the terms and conditions of the Contract (including Exhibit "H") and the requirements of NYSDEC. TRC shall provide to Client and Site Developer a draft of the Remedial Action Plan(s) for review. Site Developer and Client shall provide their comments concerning the draft Remedial Action Plan to TRC within seven days of receipt of the draft Remedial Action Plan. TRC shall incorporate such comments into the Remedial Action Plan(s) to the extent consistent with the terms, conditions and provisions of the Contract, and TRC shall deliver the revised Remedial Action Plan(s) to Client and Site Developer for review at least fourteen days prior to submission to NYSDEC. In the event that Client and/or Site Developer believe that such revised Remedial Action Plan(s) are not consistent with the terms of this Contract, Client and/or Site Developer (as applicable) shall notify TRC within four days after receipt of the revised Remedial Action Plan(s) how the Remedial Action Plan(s) should be revised to be consistent with the Contract. If TRC does not provide notice within four days thereafter that it will so modify the Remedial Action Plan, the sole remedies of Client and/or Site Developer shall be (A) to commence the Mediation and Review Procedure described in Section 29 hereof prior to the end of the fourteen day period, or (B) if Client and/or Site Developer believe that NYSDEC will agree to modify the Remedial Action Plan(s) if TRC undertakes action which would materially increase the cost of the Site Work, to agree subject to the provisions of Section 5(z) prior to the end of such fourteen day period to pay the increase in cost to TRC pursuant to a separate agreement if NYSDEC will agree to modify the Remedial Action Plan(s), in which case TRC shall use Contractor Good Faith Efforts to obtain NYSDEC's approval, and if successful TRC shall take the action required to modify the Remedial Action Plan(s). Time shall be of the essence with respect to Client's and Site Developer's communications to TRC under this Section 7(b), it being understood that if Client or Site Developer fails to notify or respond to TRC or commence the Mediation and Review Procedure (as applicable) within the time periods set forth herein, such rights shall be deemed waived. In the

NYC 357354.10 18821 00203

event that the time periods within which NYSDEC (or other Governmental Authorities with jurisdiction) requires TRC to act with respect to any matter are shorter than the time periods provided in this Section, TRC shall so notify Client and Site Developer and the time periods within which the parties must act in this Section shall be decreased accordingly but shall not be eliminated.

(c) Pre-existing Environmental Condition.

(i)    Subsequent to the Effective Date, in the event that TRC identifies a Pollution Condition which it believes is not a Pre-existing Environmental Condition, TRC shall notify Client and Site Developer within seven days and TRC shall notify Insurer within the time limits set forth in the Policies.

(ii)    In the event that a Pollution Condition is discovered that was not previously identified as a Pre-existing Environmental Condition, TRC, Client and Site Developer shall determine, pursuant to this Section 7(c):  whether the Pollution Condition is a Pre-existing Environmental Condition; the nature, extent and source of the Pollution Condition; and/or whether such Pollution Condition was caused, generated or contributed to by TRC or its Subcontractors (collectively the "Determination").

(1) TRC shall Promptly take all steps necessary to mitigate the effect of the Pollution Condition prior to any Determination (and regardless of any disputes). Client and Site Developer shall be granted access to the applicable Property(ies) for the purpose of inspecting such Pollution Condition and observing TRC's data collection with respect to such Pollution Condition.

(2) TRC shall document its Determination by preparing a report and supporting data and submitting same to Client and Site Developer.

(3) Client and Site Developer shall review TRC's Determination and notify TRC whether they agree with the Determination.  TRC agrees to review the comments of Client and Site Developer and to make a report to the Insurer as necessary to make a claim against each of the Policies (which report shall include the comments of Client and/or Site Developer, as applicable, if there is a disagreement as to the Determination).

(4) If it is determined by the Insurer that the Pollution Condition is a Pre-existing Environmental Condition, TRC shall be responsible for its Remediation.  If it is determined by the Insurer that the Pollution Condition is not a Pre-existing Environmental Condition and that neither TRC nor its Subcontractors caused, generated or contributed to the Pollution Condition, TRC shall use Contractor Good Faith Efforts to coordinate with the Insurer and to ensure Insurer's timely and efficient Remediation of such Pollution Conditions so as to minimize (or if possible eliminate) any resultant Owner Delay. If it is determined by the Insurer that TRC or its Subcontractors caused or generated the Pollution Condition, TRC shall be responsible for the Remediation and the cost of the Determination.  In the

event that the Insurer determines that TRC or its Subcontractors contributed to, but were not solely responsible for, the Pollution Condition, TRC shall be directly responsible only for that portion of the Remediation of the Pollution Condition and the cost of Determination apportioned by the Insurer to TRC; however, as to the remaining portion of the Remediation, TRC shall use Contractor Good Faith Efforts to coordinate with the Insurer and to ensure Insurer's timely and efficient Remediation so as to minimize (or if possible eliminate) any resultant Owner Delay.

(iii)    Nothing contained herein shall affect the rights of the parties to seek to limit the amount of the claim for reimbursement of Remediation costs for the newly discovered Pollution Condition under the terms of the insurance set forth in Section 8 below.

(iv)    Notwithstanding anything to the contrary in this Contract, TRC's obligations and liability under this Contract for Pollution Conditions which are not Pre-Existing Environmental Conditions shall be limited to the extent that Insurer agrees to pay TRC for Remediation of such Pollution Conditions, unless such Pollution Conditions are caused, generated or contributed to by TRC and/or its Subcontractors. In the event such Pollution Conditions are caused, generated or contributed to by TRC and/or its Subcontractors, TRC's obligations and liability for such Pollution Conditions shall not be limited as provided in the preceding sentence to the extent that TRC and/or its Subcontractors caused, generated or contributed to such Pollution Conditions.

## 8. Insurance/Assurance.

(a) TRC has procured simultaneously herewith and shall maintain throughout its term the Cost Cap/PLL Policy in the form attached hereto as Exhibit "B" as modified from time to time covering the Site, Off-Site Locations, Off-Site Items and Non-Owned Locations. Client and Site Developer have procured simultaneously herewith the insurance policy covering new Pollution Conditions at the Site in the form attached hereto as Exhibit "J" (as the same may be modified in accordance with its terms, the "New Conditions Policy").

(b) TRC shall obtain (and provide evidence to Client and Site Developer) prior to performing any of its obligations hereunder on Site or at any Off-Site Locations, and shall require all Subcontractors to obtain and maintain (by enrollment in the Wrap Up Program), the following insurance coverages substantially in the form attached hereto as Exhibit "F" (as the same may be modified with the approval of Client and Site Developer) (collectively, the "Wrap Up Program"):

(i)    Workers' Compensation - Insurance within the State of New York, including benefits provided under the United States Longshore and Harbor Workers' Compensation Act (USL&H), the Federal Employers Liability Act (FELA), and Merchant Marine Act of 1920 (Jones Act).

Part A:        Statutory
Part B:        $50,000,000 per accident and aggregate

(ii)    On an occurrence basis, protection for premises and operations (including explosion, collapse and underground), independent contractors, products/completed operations, broad form property damage, personal injury liability, and employees as insureds.

$50,000,000 per occurrence
$50,000,000 general aggregate
$50,000,000 products/completed operations aggregate

(iii)   Contractor's Pollution Liability (CPL) and Professional Liability.

$50,000,000 per occurrence and aggregate

(iv)    TRC and all Subcontractors, whether required to be enrolled in the Wrap Up Program or not, will provide evidence of insurance for all off-Site activities, and all on-Site activities after Phase I Completion, as follows:

(a)    Workers' Compensation

Part A          Statutory
Part B          $1,000,000 per accident

(b)    Commercial General Liability

$1,000,000 per occurrence

(c)    Automobile Liability and/or Transporters Liability including, if carried by each such Subcontractor, CA 48 form Pollution Liability coverage.

$1,000,000 per occurrence

(d)    Excess Liability

$5,000,000 per occurrence

(c) TRC shall name Client, Site Developer and Site Developer's lender(s) as "Additional Insureds," as that term is employed in such policies, under the policies set forth in Section 8(b) above and shall provide a certificate evidencing that all coverages identified in Section 8(b) have been obtained. The insurance set forth in Section 8(b) shall be maintained until the later of Phase I Completion, completion of the Off-Site Locations and completion of the Off-Site Items (and thereafter TRC shall maintain only the coverages described in Section 8(b)(iv)) and such coverage may not be suspended, cancelled, or voided, and such policies shall provide that coverage shall not be changed or reduced except after thirty days prior written notice by certified mail, return receipt requested to Client and Site Developer. The insurance companies issuing the policies shall have no right of recovery or subrogation against Client, the Site Developer, their subsidiaries,

affiliates or shareholders, or current and former owners and/or parties with any interest in or obligation associated with the Site. The coverage set forth above shall be primary as to Client. At Client's or Site Developer's request, TRC shall add additional parties as Additional Insureds under the policies in Section 8(b).

(d) TRC shall deliver to Client, prior to commencement of the Site Work on any Property, dual obligee payment and performance bonds issued in favor of Insurer and TRC (or, if permitted by the bonding companies without additional cost, bonds in favor of Client, Insurer, TRC and Site Developer) for the full cost of the Demolition and Decommissioning to be performed by each Subcontractor, which bonds shall by their terms remain in effect until the applicable Site Work is complete and cover all changes in the applicable Site Work contemplated or permitted by this Contract, and which shall be in form reasonably acceptable to Client and Site Developer. Such bonds shall be issued by Liberty Mutual Insurance Company, The Hartford Insurance Company, Kemper Insurance Company or any other insurance company licensed to conduct business in the State of New York with a Best's rating of "A-" or better.

(e) In each circumstance under this Contract where a requested change in the Site Work would cause a material increase in the cost of the Site Work and Con Edison and/or Site Developer (or Developer Owner) has the option of requiring TRC to complete such change by paying TRC's increased costs, the party requiring the change shall be required to pay any additional premiums that may be required by the Insurer to provide coverage under the Policies (or under separate policies, if required under this Contract) for such changes in the Site Work.

9. **Representations and Warranties of TRC.**

TRC hereby represents and warrants that:

(a) TRC Companies, Inc. is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and duly authorized to conduct business in the State of New York. TRC Engineers, Inc. is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey and duly authorized to conduct business in the State of New York. TRC Environmental Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut and duly authorized to conduct business in the State of New York.

(b) TRC has all requisite corporate power and authority to execute, deliver and perform its obligations under this Contract.

(c) The execution and delivery of this Contract, and the performance by TRC of all its obligations hereunder, have been duly and effectively authorized by all necessary corporate action on the part of TRC.

(d) This Contract has been duly executed and delivered by authorized representatives of TRC.

(e) The execution and delivery by TRC of this Contract and the performance by TRC of its obligations thereunder will not: (i) result in a breach of any of the terms or provisions of, or

constitute a default (or a condition which upon notice or lapse of time or both would constitute a default) under any agreement, instrument or obligation (including its certificate of incorporation and by-laws) to which TRC is a party or by which TRC is bound; and (ii) will not constitute a violation of any Law.

(f) There are no judgments, actions, suits, or proceedings existing or pending (or, to the knowledge of TRC's officers, threatened) against TRC which can reasonably be expected to have a material adverse effect upon its performance of the Contract.

(g) This Contract constitutes the legal, valid, and binding obligation of TRC, enforceable against TRC in accordance with its terms (subject to the availability of equitable remedies and to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally).

(h) It has satisfied itself as to the nature and location of the Site, including, but not limited to the nature, scope and extent, of the: (i) Conditions; (ii) Site Work requirements; (iii) disposal requirements, including all requirements and limitations established by Laws; (iv) material storage and handling requirements, including all requirements and limitations established by Laws; (v) the availability of labor; (vi) security requirements, including all requirements and limitations established by Laws; (vii) all other applicable general and local conditions which may be material to TRC's performance of the Site Work, including those relating to: traffic; transportation; site access; and availability and location of utilities; (viii) the character, quality and quantity of surface and subsurface buildings, structures, platforms, slabs and edifices as well as all materials that could be encountered; (ix) equipment and facilities needed preliminary to and during the prosecution of the Site Work; and (xiii) uncertainties of weather.

(i) Client and Site Developer have and had no obligation under this Contract to provide any data, documentation or information that TRC needs to assess the nature, scope and extent of Conditions at, on, under, or emanating to or from the Site, Off-Site Locations and/or Off-Site Items and have no obligation to furnish any additional information to TRC (except as set forth in Section 6(k)), and TRC has performed its own investigation of the Conditions as TRC has deemed necessary prior to entering into the Contract.

(j) TRC has the financial resources to execute the Site Work with diligence to Phase I Completion and Long Term Completion and provide indemnification to Client and Site Developer in accordance with Section 11 herein, even if the Conditions exceed TRC's estimate thereof, and TRC pledges to use all necessary resources to achieve Phase I Completion and Long Term Completion.

(k) TRC and all its Subcontractors are qualified to perform the Site Work consistent with this Contract, they have sufficient expertise and experience to accomplish same, and TRC and its Subcontractors have sufficient experience and expertise to understand the general nature of, as well as the safety risks and requirements posed by, the activities at the Site. TRC further represents and warrants that TRC and its Subcontractors shall perform the Site Work in compliance with this Contract and Laws, the standards and conditions established and required by the Client as set forth in Exhibit "C," and the standards of care and diligence normally practiced by nationally recognized consulting/engineering firms performing services of a similar nature. The

obligation to comply with the standards and conditions of Con Edison in Exhibit "C" shall continue to apply to TRC following a transfer in ownership of any Property(ies).

(l) TRC is familiar with the hazardous, geologic, environmental issues and Conditions at the Site and assumes the risk of all such issues and Conditions and will, regardless of the exact nature of such issues or Conditions, or the expense or difficulty of performing the Remediation, Demolition and Decommissioning with respect to same, complete the Site Work to Long Term Completion for the Contract Price without any opportunity for additional remuneration (i.e., "change orders") from Client or Site Developer. For the avoidance of doubt, TRC assumes the risk of and shall be fully responsible for, and shall not receive extra payment from Client or Site Developer (or any other additional compensation) with respect to, all soil, surface, subsurface, covered and/or concealed or hidden conditions, or other circumstances or conditions (adverse or otherwise) whatsoever, whether known or unknown, relating to or affecting the Site.

(m) TRC has provided Insurer with access to all of the information in its possession concerning the Conditions at the Site, including, but not limited to the documents and reports listed at Exhibit "G" and attached hereto.

(n) TRC recognizes that Site Work at one Property (e.g., 708 First Avenue) may occur while another Property (e.g., Waterside) continues to operate, and that Con Edison will continue certain operations on portions of 708 First Avenue and 616 First Avenue after other portions of these Properties have been delivered to TRC, and TRC will ensure that the business activities and operations at such other Property or Properties (or portions thereof) are not hindered, delayed or prevented as a result of the Site Work activities.

(o) TRC recognizes and acknowledges that one or more of the Properties may be transferred from Con Edison to a Developer Owner at any time prior to completion of the Site Work. Except as provided in Section 12 below, or otherwise provided in the Contract, the rights and obligations of TRC shall not be eliminated or altered as a result of such transfer.

## 10. Client's Representations and Warranties.

Client hereby represents and warrants to TRC as follows:

(a) Client is a corporation duly organized, validly existing and in good standing under the laws of the State of New York.

(b) Client has all requisite corporate power and authority to execute, deliver and perform its obligations under this Contract.

(c) The execution and delivery of this Contract, and the performance by Client of all its obligations hereunder, have been duly and effectively authorized by all necessary corporate action on the part of Client.

(d) This Contract has been duly executed and delivered by authorized representatives of Client.